Argued April 2, reargued June 15, affirmed July 28, rehearing denied September 22, 1914.

## KOEHLER *v.* DENNISON.

(143 Pac. 649.)

**Cancellation of Instruments — Sales — Remedy at Law — Remedies of Purchasers—Nature and Form—Law or Equity.**

1. For fraud in inducing the purchase of a barber-shop, the person aggrieved has a remedy at law for the recovery of the consideration paid, treating the transactions as rescinded, or in equity to cancel the bill of sale.

[As to cancellation notwithstanding remedy at law, see note in 9 Am. St. Rep. 859.]

**Fraud—Representations of Agent—Liability to Principal.**

2.   Where a barber practically represented to plaintiff that he was engaged in finding suitable locations for persons desiring places to conduct their business, and plaintiff acted upon information given by the barber by going into a barber-shop which was for sale, he thereby made the barber his agent, establishing a relation of trust and confidence, rendering the barber liable for deceit in stating that a lease of the premises would be obtained.

> [As to liability of principal for fraud of agent as dependent on whether fraud is committed for benefit of principal, see note in Ann. Cas. 1913B, 829.]

**Sales—Excessive Consideration—Fraud.**

3.   The fact that a seller of a barber-shop received much more than its reasonable value affords no justification for setting aside the sale, when assented to by a party who is *sui juris*, unless the assent was induced by fraud.

**Sales—Fraud of Seller—"Lease."**

4.   Where the seller of a barber-shop represented to the purchaser that a lease of premises could be obtained, the parties unquestionably understood by "lease" a writing executed by the owner evidencing a demise for a reasonable term, and not merely the acceptance of rent for a month.

**Sales—Fraud of Seller.**

5.   A seller of a barber-shop and a broker prosecuting the sale, who represented that a lease of the premises would be secured, which they knew would not be done, are liable for the misstatements.

> [As to action to recover for false representations, see note in 18 Am. St. Rep. 555.]

**Sales—Remedies of Purchaser—Recovery of Price—Conditions Precedent.**

6.   Where the seller of a barber-shop notified the purchaser that he would not repay any of the money received from him, the purchaser need not make a demand therefor before suing for its recovery.

**Sales—Remedies of Purchaser—Recovery of Price Paid—Conditions Precedent.**

7.   A delay of six weeks by the purchaser of a barber-shop, before offering to return the property, during which time he was trying to realize the profits which the seller and broker represented to him would be made, was not unreasonable.

From Multnomah: HENRY E. McGINN, Judge.

In Banc.   Statement by MR. JUSTICE MOORE.

This is a suit by A. E. Koehler against E. Dennison and J. I. Hull to cancel a bill of sale of personal property and to recover the sum of money paid therefor.

The complaint charges, in effect, that the defendants, having previously learned that the plaintiff had on hand money exceeding $1,025, conspired to cheat and defraud him out of that sum; that on February 17, 1913, the plaintiff was ill, and in consequence thereof was weak in body and mind, at which time the defendants overpersuaded him to deliver to Dennison $1,025 for a bill of sale of barber chairs, glasses, fixtures, etc., which property was then practically valueless; that, pursuant to such conspiracy, the money was obtained by fraud, in that the defendants falsely represented to plaintiff that if he would pay that sum for the property and take possession of the barber-shop at No. 205 Morrison Street, Portland, Oregon, then conducted by Dennison, he would, as soon as the sale was consummated, secure a lease of the premises, and by continuing the business, be able to earn therefrom $5 and $10 a day above all expenses; that such representations were false and so known to be by the defendants, who made them for the purpose of defrauding the plaintiff; that he was ignorant thereof, but, relying thereon, was induced to pay the sum stated for the property; that after obtaining the title thereto he discovered, by conducting the business, that, instead of daily clearing the sums so asserted, he lost from $10 to $15 a week; that he was unable to secure a lease of the premises, and soon after taking possession thereof he was ejected therefrom; that he tendered to Dennison a good and sufficient bill of sale retransferring to him the title to the property mentioned, and deposited such written instrument with the clerk of the Circuit Court for him.

A motion to make the complaint more definite and certain and to strike out parts thereof was denied, and a demurrer to the initiatory pleading, on the ground that it did not state facts sufficient to constitute a cause

of suit, was overruled, whereupon the defendant Dennison filed an answer admitting the sale of the property for the consideration stated, but denying all other averments of the complaint. For a further defense it is alleged that the plaintiff has an adequate remedy at law; that he has rendered it impossible to place Dennison *in statu quo,* in that his misconduct caused him to be dispossessed of the barber-shop, thereby destroying the goodwill of the business; that by reason of the sale the plaintiff remained in the possession and control of the business more than six weeks, during which time he made no complaint to Dennison, by reason whereof he acquiesced in the transaction and is estopped by his laches from asserting that he was defrauded.

The reply put in issue the allegations of new matter in the answer, and, the cause having been tried, findings of facts were made substantially in conformity with the averments of the complaint, and a decree having been given as prayed for therein, Dennison appeals.

AFFIRMED.    REHEARING DENIED.

For appellants there was a brief over the names of *Messrs. Joseph & Haney* and *Mr. B. H. Goldstein,* with oral arguments by *Mr. Bert E. Haney* and *Mr. Goldstein.*

For respondent there was a brief with oral arguments by *Mr. Morris A. Goldstein* and *Mr. Frank S. Senn.*

MR. JUSTICE MOORE delivered the opinion of the court.

It is contended that errors were committed in denying the motion and in overruling the demurrer. The averments of the complaint as hereinbefore given are

not arranged in the same order as originally set forth, but it is believed that the allegations of the pleading thus assailed are substantially stated, and that the facts narrated are not so vague or uncertain that the meaning thereof could not have been readily comprehended, or that any parts of the complaint should have been stricken out.

1. For a redress of his grievance the plaintiff had a concurrent remedy at law and in equity. In an action at law for affirmative relief he might have treated the transaction as rescinded and recovered back the consideration paid for the property. By this means he would still have held the written evidence of a transfer of the title to the goods, to cancel which bill of sale, though not under seal, the remedy at law was not so adequate and complete as that which equity affords: *Benson* v. *Keller,* 37 Or. 120 (60 Pac. 918); *Olston* v. *Oregon Water Power & Ry. Co.,* 52 Or. 343 (96 Pac. 1095, 97 Pac. 538, 20 L. R. A. (N. S.) 915). What is here said is not intended to contravene the rule which permits a party who seeks defensive relief at law to set up in his answer the plaintiff's fraud, and thereby defeat an action brought to enforce the alleged fraudulent obligation: *Mael* v. *Stutsman,* 60 Or. 66 (117 Pac. 1093). No error was committed in overruling the demurrer.

Considering the case on its merits, the testimony shows that at the time of the trial the plaintiff was 73 years old. He was not a barber. He had been engaged in raising fruit, but, having lost a leg, he was obliged to seek other employment, which he found in conducting at Portland a confectionery store. Having sold that business, he tried to find a new location where he could pursue the same occupation. While seeking another place he on February 15, 1913, met the defend-

ant Hull, a barber, who said he was engaged in securing for others business locations, and could find a place for him, if he would wait, thereupon taking him into a barber-shop conducted by Dennison, where the latter told him he intended to quit the business in order that he might deal in horses. The plaintiff testified that Dennison then said to him:

"If you buy this shop you can make from $5 to $10 a day clear. All you have to do is to sit here and count your money."

This witness, referring to the defendant Hull, said:

"I told him that if I bought it [the shop] I should want a lease. Well, he asked Mr. Dennison and Mr. Dennison asked Mr. Soloman [the lessee of the premises]. They had talked it over, and Mr. Soloman said: 'Why, of course, you will get a lease whenever you ask for it.' He said: 'Whenever you ask for a lease there will be a lease forthcoming.' 'I don't want to cheat a cripple like you.' I said: 'I don't want to be cheated either.' When I made up my mind to buy this barber-shop I made up my mind never to buy it without a lease, and I bought it with that understanding."

The sale was concluded February 17, 1913, whereupon plaintiff paid the sum agreed upon for the property, took possession of the shop, and paid Mr. Soloman $90, as the rent in advance for a month. The plaintiff, during that time, was offered $800 for the property which he had secured from Dennison, and, desiring a lease of the premises, he applied to Soloman, who refused to grant the request, and on March 15, 1913, two days prior to the expiration of the term for which he had paid the rent, Soloman commenced an action against him to secure possession of the shop. This action, however, was subsequently dismissed.

The plaintiff, referring to one of the defendants, who at the time the sale was made promised to remain in the shop and assist in conducting the business, testified as follows:

"And this Joe Hull, he was trying all the time to get me out of there, to get another place; and then him and another man they went up and they rented a place on Sixth and Burnside, and I went up there, and I didn't make anything up there neither. I didn't make the rent on either place."

The value placed by Hull on the entire property was only $700, while another man who knew the worth of the goods estimated it to be not more than $300. The profits of the business were not what the defendants had represented. Their witnesses, explaining the reason therefor, stated that the plaintiff increased the price of shaving from 10 cents, the cost prevailing when he secured the property, to 15 cents, and that he permitted five of the eight barbers employed by Dennison to leave the shop, and did not get others to take their places.

The plaintiff did not make any demand upon Dennison to repay any part of the money which he had received before bringing this suit. He testified that he told Dennison that he had misrepresented the property and the value of the business, whereupon the latter remarked that, having sold the goods, he paid Hull a commission for finding a purchaser, and he would not return the money.

It appears that after plaintiff quit the shop the premises were immediately leased to another barber. Dennison, soon after concluding the sale with the plaintiff, obtained another barber-shop and conducted that business, though it will be remembered he told Koehler

when he made the bill of sale that he was retiring in order to deal in horses.

Soloman, as defendants' witness, admits that he told the plaintiff he did not desire to cheat a cripple. The defendants deny nearly all the testimony given by the plaintiff, and each asserts upon oath that no commission was paid to Hull.

2. No testimony was offered tending to show that when the bill of sale of the property was concluded the plaintiff was ill or weakened in body or mind. A perusal of his testimony, however, shows that he is peevish and irascible, evidencing senility. Neither of the defendants made any representations respecting the value of the goods sold, but only as to the future profits that could be obtained by conducting the barber business. Nor did they in any manner do anything to prevent the plaintiff from making a careful examination or due inquiry as to the value of the property or the receipts obtained from the prior management of the shop. It will be assumed, without deciding the question, that the representations about the profits were not statements of past or present material facts, amounting to a warranty, and that they were nothing more than expressions of opinion relating to uncertain future gains; yet it is believed that the relation existing between the plaintiff and Hull, who assumed to act as a broker, was confidential, requiring from the latter a full disclosure, and that Hull's connection with Dennison makes them legally responsible for the consequences resulting from the failure to obtain a lease of the premises.

The plaintiff's testimony on this subject is as follows:  ·

"This spring when I was looking for a confectionery store I ran across Joe Hull, and he said that he was

engaged in that kind of business, and that he would find me one. If I would wait he would help me find one. He looked around and commenced to talk about a certain place, and then he took me in and asked me how I would like a barber-shop. I told him: 'I am no barber. I don't know anything about the business.' He said: 'In this case you wouldn't have to be a barber, because this is a good place here, and the money would be coming in without your working.' I said: 'I don't understand it, and I would sooner have a confectionery.' And he took me up, and we faced the other party, Mr. Dennison.''

It will thus be seen that Hull, who was a barber, practically represented to the plaintiff that he was engaged in finding suitable locations for persons desiring places where they could conduct their business. The plaintiff acted upon this information by going into the barber-shop to meet Dennison, thereby making Hull his agent, establishing the relation of trust and dependence between them, and rendering the latter liable for the deceit: *Shute* v. *Johnston,* 25 Or. 59 (34 Pac. 965).

3. Though there is no direct evidence upon this subject, it is believed to be reasonably inferable from the testimony that the defendants by concert of action obtained a purchaser, of whom Dennison said after the sale was made, as reported by a witness: "I found a sucker." The declaration thus imputed to Dennison is referred to only as tending to show that he received from his goods and business a sum of money which he evidently considered to be much greater than their reasonable value. Such fact, however, affords no justification for setting aside a sale of property when assented to by a party who is *sui juris.* A court cannot relieve from the consequences of an improvident bargain a person who was easily duped, unless his as-

sent to the transaction was induced by fraud as a basis
for equitable intervention.

4, 5. These defendants, knowing that it was unlawful
for Koehler himself "to pursue the business of a bar-
ber, or to conduct any barber-shop" (Section 4814,
L. O. L.), undertook to get from him all the money
possible to secure which they, as a part of the con-
spiracy alleged, made to him, as inducements to the
sale of the property, statements which were not ex-
pected to be carried out so far as they related to obtain-
ing a lease from Soloman, whose promise to that effect
was not given until after the money had been paid for
the property. Soloman accepted from Koehler the
stipulated rent in advance for a month thereby entitling
him to the possession of the barber-shop for that time.
The parties unquestionably understood by the use of
the word "lease," as employed by plaintiff, that it
meant a writing executed to him by Soloman evidencing
a demise of the premises for a reasonable term. Den-
nison and Hull, after conferring with Soloman, agreed
with plaintiff that a lease should be executed to him,
and their promise in this respect, though it related to
the future, and was to be executed by another person,
was somewhat in the nature of a covenant for further
assurance. It was not capable of specific performance,
but, the representations having been made for the pur-
pose of effecting a sale of the property, the defendants
are liable for the consequences of their misstatements,
which they evidently knew would never be performed.
Pursuant to their unlawful agreement Hull persuaded
the plaintiff to vacate the premises, and soon thereafter
he quit working for him.

6. If Dennison did not intend to repay any of the
money received from the plaintiff, and so notified
him, as he testified, he was not obliged to do a vain

thing; and hence it was unnecessary to make a demand therefor.

7. The plaintiff was somewhat tardy in offering to return the property, but when it is kept in mind that he was trying to realize the profits represented, which could not at once be determined, the delay in demonstrating the experiment was not unreasonable.

We do not think it essential further to quote from or comment upon the testimony or to advert to any reason the court may have given for the conclusion which it reached, for, deeming the decree proper, it should be affirmed, and it is so ordered.

AFFIRMED. REHEARING DENIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE EAKIN, MR. JUSTICE BEAN and MR. JUSTICE MCNARY concur.

MR. JUSTICE EAKIN delivered the following concurring opinion:

The contention of the defense is that, the representations of which plaintiff complains were but expressions of opinion or a puffing of the business, and related to what could or would be made out of it, and were not representations of fact. Some of the representations were: "This is as good a shop as there is in Portland"; that he (Dennison) had made good; that plaintiff was to have a lease of the building whenever he asked for it; "you can make from $5 to $10 a day; all you have to do is to sit here and count your money"; that he would soon learn about the barber business; "and I will be here and help you run it, and all of the barbers here; you will be satisfied; you can't wish for anything better." The plaintiff from his examination as a witness appears, to have been a childish old man with little or no memory, and he was extremely credulous

and willing to, and did, accept statements as to conditions without verification. He seems to have been entirely ignorant of business methods, of which defendants were aware. The furniture was out of style and much of it re-covered; some of it being out of repair and unfit for use. There is testimony tending to show that the chairs were not worth more than $120. The goods sold were not worth more than $300 or $400. When we consider that plaintiff knew nothing about the business and could not judge of it for himself, then a statement by one who knows the facts impliedly affirms that he is familiar with the facts which justify his opinion, and that they amount to more than a mere statement of opinion. It is said in *Stebbins* v. *Eddy,* 4 Mason, 414, 423 (Fed. Cas. No. 13,342):

"It has been suggested * * that fraud cannot be predicated of belief, but only of facts. But this distinction is quite too subtle and defined. The affirmation of the belief is an affirmation of a fact—that is, of the fact of belief—and if it is fraudulently made to mislead or cheat another, to abuse his confidence, or to blind his judgment, it is in law and morals just as reprehensible as if any other fact were affirmed for the like purpose. The law looks, not to the nature of the fact averred, but to the * * design of the affirmation."

As a general rule, the mere expression of an opinion which is understood to be only an opinion does not render the person expressing it liable for fraud; but, where the statements are as to value or quality, and are made by a person knowing them to be untrue, with intent to deceive and mislead the one to whom they are made, and by which he is misled, they may amount to an affirmation of fact rendering him liable therefor. The rule that no one is liable for an expression of an opinion is applicable only when the opinion stands by

itself as a distinct thing. In this case defendants intended by these statements, which they knew to be false, and being aware that plaintiff knew nothing of the facts, to mislead the plaintiff and prevent further investigation by him. It is not only true in this case, but in many others, that the plaintiff was an easy victim and had too much confidence in strangers; and, when the transaction shows a deliberate purpose to take advantage, a court cannot close its eyes to such fraud. See *Olston* v. *Oregon, W. P. & Ry. Co.,* 52 Or. 343 (96 Pac. 1095, 97 Pac. 538, 20 L. R. A. (N. S.) 915), where this question is more fully discussed. Neither was the plaintiff violating the law in seeking to become owner of a barber-shop, not being a licensed barber. The language of the barbers' act, Section 4814, L. O. L., that "it shall be unlawful for any person, not a registered barber * * to pursue the business of a barber," is intended to prevent only the doing of the work of a barber. Section 4822, L. O. L., gives its meaning thus: "To shave, or trim the beard, or cut the hair, of any person for hire, * * shall be construed as practicing the occupation of barber." Section 4823, L. O. L., punishes one only for a violation of the act, and the plaintiff is not thereby prevented from seeking a remedy in a court of equity.

The decree is affirmed.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

I am unable to concur with the conclusion reached by Mr. Justice MOORE in this case for the following reasons:

Taking the statements of the plaintiff at their full value, they cannot amount to anything more than puf-

fing or boasting of the business which the defendant Dennison had for sale. These statements are denied by both defendants, and the clear weight of the testimony is in their favor. The plaintiff had full opportunity to investigate the business he was about to purchase, and the fault is his if he listened to roseate opinions instead of ascertaining facts easily within his reach. He complains that he was promised a lease by the landlord of the defendant Dennison. Without dispute the testimony shows that the landlord himself had only a tenancy from month to month; that he sublet on like conditions to the defendant Dennison, and extended the same terms to the plaintiff, who paid one month's rent in advance, and refused to pay further. The latter makes no statement whatever as to the terms of the lease which he says was promised. It is not reasonable to suppose that the defendant Dennison or his landlord would promise a greater estate in the premises than they had themselves.

It is contended by the plaintiff that he was deceived by the representation which he says was made to the effect that he would make from $5 to $10 per day. He does not pretend to say that it was represented to him that this would be net profits. His own exhibit offered in evidence shows that for two weeks after he took charge of the business he never took in less than $5 per day, except on one date when the receipts amounted to $4.90. From that they ranged as high as $9.70 during the period mentioned.

Passing this, a second reason for dissent is found in the fact that it was not until he had experimented with the business for six weeks and had worked out a failure that he manifested his desire to rescind the agreement. The rule in such cases was very plainly

laid down by Mr. Justice BEAN in *Scott* v. *Walton,* 32 Or. 460, 464 (52 Pac. 180, 181), as follows:

"A party who has been induced to enter into a contract by fraud has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return, or offer to return, what he has received under the contract. He cannot retain the fruits of the contract awaiting future developments to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract."

He must have known as well at the end of the first week as later that the receipts of the business were not meeting his expectations, and it was his duty to act promptly, and not continue what he must have then known was an unsuccessful venture on his part. We find him, however, continuing the business, making changes in the personnel of the employees whom he found engaged in the shop when he bought it, reducing the force to three barbers, and not only so, but he also increased the price of service, broke up the location of the shop, and changed its situation so as to utterly destroy the goodwill of the establishment. By his own acts and procrastination he put it out of his power to restore what he had acquired from the seller, and thus to do that equity, incumbent upon anyone, who would rescind a contract for fraud practiced upon him.

Moreover, aside from all this, the plaintiff does not come into a court of equity with clean hands. Section 4814, L. O. L., declares that "it shall be unlawful for any person, not a registered barber, * * to pursue the business of a barber, or to conduct any barber-shop. * * " The plaintiff was evidently engaged in what he knew was a violation of a public law, and a general rule of equity is to leave such persons where the court of chancery finds them. The plaintiff's avarice led him into making what turned out to be an improvident bargain as he managed the concern, coupled with an unlawful business on his part, and he ought not to be relieved from its consequences. He is beyond the aid of equity because he has put it out of his power to do equity and because he is asking the court to relieve him from the consequences of his purpose to violate the law. For these reasons, I am compelled to withhold my assent to the conclusion reached by my learned brother.

MR. JUSTICE RAMSEY concurs in this dissenting opinion.