Argued March 10, reversed and remanded April 12, 1921.

## EIVERS v. PEARD.

(197 Pac. 264.)

**Goodwill—Evidence Held to Show Buyer of Business Defrauded by Misrepresentation as to Daily Sales.**

1. In an action by the buyer of a millinery business to rescind the sale on account of the seller's fraud, evidence *held* to justify finding that plaintiff buyer was defrauded, in that defendant seller misrepresented that her sales amounted to some $50 a day.

**Trial—Case Should be Submitted to Jury on Evidence Competent to Sustain Verdict.**

2. It is not only the right, but it is the duty, of the court to sustain motion for directed verdict in a proper case; but, where there is competent evidence to sustain the verdict, the case should be submitted to the jury.

Goodwill—Whether Buyer Seeking to Rescind Barred by Delay in Giving Notice After Discovery of Fraud Held Jury Question.

3. In an action by the buyer of a millinery business to rescind on account of the seller's misrepresentations that she did a business of $50 a day, whether plaintiff buyer's delay of thirteen days after discovering the fraud before giving notice to rescind was unreasonable, so that he is barred by his laches, *held* for the jury under the evidence.

From Multnomah: HARRY H. BELT, Judge.

Department 2.

March 31, 1919, the defendant was the owner of a business in the City of Portland, known as "The Hart Millinery" store.

Plaintiff alleges on that date that the defendant, with intent to deceive and defraud, falsely and fraudulently represented to him that the business was profitable and in a flourishing condition and the daily sales would average $50; that relying upon such statements and representations, he was induced to and did purchase the business for which he paid the defendant $950 and took possession and that he purchased "a new stock of millinery and expended his best efforts to make said business a success"; that in the month of April, plaintiff learned that the average daily sales were only about $11; that upon learning the true situation and on April 29, 1919, the plaintiff tendered back the business "agreeing to account for any stock which had been disposed of by him since the said purchase and demanded of defendant a return to him of the purchase price paid therefor." It is then alleged that the defendant has ignored the tender and refused to return the money and that plaintiff has elected to rescind the sale and tenders the business to the defendant, and prays for judgment for the purchase price with interest and costs.

The answer admits the execution of the bill of sale of the business to the plaintiff, and further alleges that it was made after a thorough investigation by the plaintiff of the stock, fixtures, and records of the daily sales, and denies all other material allegations of the complaint.

The reply admits that "certain sale slips" were exhibited but denies that they were complete or accurate or that the plaintiff "had any means of determining the said average daily sales other than information thus furnished by defendant."

The cause was tried to a jury, and after the plaintiff had rested, the defendant filed a motion for a directed verdict upon the grounds:

1. That "the complaint does not state facts sufficient to constitute a cause of action, that is, it does not state facts sufficient to constitute rescission which they have brought here.

2. "The evidence in this case shows that after they had full knowledge of the fraud they ratified it by their acts and handled the goods as their own.

3. "For the reason that they have never tendered or offered to tender the stock which they bought, back to the defendant. * *

4. "For the reason that they have not offered to place the defendant *in statu quo.* * * "

The motion was sustained, and a verdict was rendered for the defendant upon which judgment was entered. After plaintiff's motion for a new trial was overruled, he appealed, assigning as error the sustaining of defendant's motion for a directed verdict and the overruling of the motion for a new trial.

REVERSED AND REMANDED.

For appellant there was a brief over the name of *Messrs. Gebhardt, Scudder & Hendrickson,* with an oral argument by *Mr. J. H. Hendrickson.*

For respondent there was a brief over the name of *Messrs. Collier & Collier,* with an oral argument by *Mr. H. E. Collier.*

JOHNS, J.—As a military man, the plaintiff may have been a good fighter, but he appears to have been a lamb in the millinery business. Defendant had a very small store which she advertised for sale. Mrs. Ramsey is a sister-in-law of the plaintiff and claims to have some knowledge of the millinery business. Seeing the notice, she called at the defendant's store, and then made some little inquiry and investigation and later returned with the plaintiff. Both Eivers and Mrs. Ramsey testify that, before the sale was made, the defendant represented that her business was in a flourishing condition and that her daily sales would average $50 per day, with an overhead expense of only $5 per day, and that she exhibited to them certain slips of the daily business which with others, that she claimed were lost or missing, showed that she was doing a business of $50 per day. No inventory was taken, and the evidence is not clear as to the actual value of the stock, but it is something near $200. Plaintiff and Mrs. Ramsey claim that in making the deal they attached but little importance to the value of the stock, but that they did rely upon the statements and representations of the defendant as to the amount of her daily business. There is ample testimony from which a jury could find that the defendant did make statements and representations to the plaintiff that her daily business would average $50, with an overhead expense of $5 per day; that such statements and representations were false and fraudulent; that the plaintiff relying thereon was deceived and misled and by reason thereof was in-

duced to make the purchase and pay the $950. The evidence is conclusive that he was fleeced in the deal and got but little, if anything, for his money.

The defendant contends that the contract was never rescinded, because the plaintiff did not act promptly and return or offer to return the stock which he purchased; that he could not and did not offer to place the defendant *in statu quo;* that after the discovery of the alleged fraud, he continued in the selling of and dealing with the property as his own and that he never offered to return it to the defendant. It appears that the plaintiff had but little, if any, business experience, and that he did not know anything about the millinery business, and that in making the deal he relied more or less upon Mrs. Ramsey; that no inventory was ever taken and only a partial examination of the records of the purported daily sales slips was ever made, and in fact, that no complete record of them was ever kept. For about a week or ten days after the deal was closed, the weather was bad and stormy, and although there was only a little business, that was supposed to be on account of climatic conditions. The testimony is conclusive that on or about the sixteenth day and for the first time, the plaintiff knew and then realized as the record shows, that he had been "stung":

"Q. Now about sixteen days after you went into that business had you installed your new stock of goods?

"A. Yes. We had bought from the time we took over the store, we bought stock.

"Q. After the sixteen days did you make any sales and continue to build up the business?

"A. We did.

"Q. Were you making sales all the time?

"A. We did.

"Q. How much did your average daily sales amount to for the sixteen days and you had discovered the fraud?

"A. Same as the second week; twelve or thirteen dollars a day; probably a little more.

"Q. During the third week you say your sales were about the same as on the second and first; how were they on the fourth?

"A. I don't think we did anything the fourth week outside of two or three or four customers. The rest was done by the dressmaker finishing work she had took in.

"Q. Now, also, did you try to sell or dispose of the stock after you were defrauded?

"A. I didn't. I sent it to where I got it.

"Q. You mean to tell the jury you had increased the stock, that is, you had sold out some of the goods and put in other goods and tendered the stock back in the condition it was at the end of a month?

"A. With the increased stock; yes.

"Q. And you continued in the business after the sixteenth of the month and tried to make a success of it up until the first?

"A. I did.

"Q. After you discovered the fraud?

"A. I did.

"Q. You increased your stock and sold from the stock and conducted the business the same thereafter as before?

"A. I did.

"Q. That is to say, if your business by your efforts you had built it up until you were making a hundred dollars a day, or an attractive business satisfactory to you, you would retain the business?

"A. I would be in the business still."

As to a conversation with the defendant Mrs. Ramsey testified:

"Q. Was there any conversation between you as to what the maximum sales ran, that is, the largest day?

"A. She told me her business was picking up, that she made $150 one day. She said, 'The season is

coming open now, I made $150.' That is when she increased the price of her business.''

When asked whether she would have continued after the business had increased, Mrs. Ramsey testified:

"No, I would not have continued. * * It takes some months to build up a trade where it has been run down. * * The business had to be there. That is what we were buying it for. I wasn't buying anything I had to work for. I could not afford to; I would not continue.''

From this evidence it is fair to assume that on April 16th the plaintiff knew that he had been defrauded. April 29th, the plaintiff wrote the defendant a letter in which, among other things, he said:

"As an inducement to the purchase you represented to me that your average daily sales amounted to $50, and it was relying on this representation that I took over the business. * * I have since found out that this representation was false, that your daily sales averaged only about $11 and that the largest day's business which the store had done amounted to only $29.'' That he had taken an inventory of the stock and found it to be worth about $200. "I desire to turn back the business, trade, fixtures and stock to you and receive from you the purchase price paid by me. I therefore hereby tender you back the said business and trade fixtures together with so much of the stock turned over to me at the time of the sale as is now unsold and agree to account to you for such of this stock as I have sold since taking possession of the store together with whatever interest in the lease of the property I may have. * * I wish you to understand that I consider the sale of the same to be rescinded and demand an immediate repayment to me of the full amount of the purchase price paid. Unless the matter can be adjusted in accordance with the terms of this letter by May 2d, I will be com-

pelled to close the shop, store the stock at your expense and bring an action to enforce my claim.''

The defendant ignored and did not acknowledge or recognize the receipt of this letter. It appears that the plaintiff sold at least a portion of the stock which he bought from the defendant, and that he purchased other and different goods and mingled them with that stock, and that he did not make his election and serve the notice to rescind until thirteen days after he realized that he had been defrauded. Based upon such facts, the defendant contends that the laches of the plaintiff amounts to confirmation of the sale, and that the plaintiff cannot place her *in statu quo,* and it is very probable that it was for such reasons the trial court sustained defendant's motion for a directed verdict. The question as to the length of time in which a contract for the sale of personal property may be rescinded after the fraud has been discovered has been the source of much litigation and has resulted in numerous conflicting decisions. When analyzed, each case has been decided on its own particular facts and the surrounding circumstances. *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180), was a suit to rescind an alleged fraudulent sale of real estate in which this court says:

''A party who has been induced to enter into a contract by fraud has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract awaiting future developments to determine whether it will be more

profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract.''

*Crosson* v. *Murphey,* 31 Or. 114 (49 Pac. 858), was a suit ''to rescind a contract for the sale and delivery of a quantity of merchandise,'' and it was there held:

''It is a rule of almost universal application that where a defrauded party elects to rescind a sale or other contract he must annul it as a whole, and must return the consideration received, so that the parties may be again, as far as possible, on an even footing. * *

''The commencement of a suit to rescind a contract of sale, voidable for fraud, three weeks after the vendor discovered the fraud, is not such an unreasonable delay as to warrant the inference of an affirmance of the agreement on his part.''

*Koehler* v. *Dennison,* 72 Or. 362 (143 Pac. 649), was a suit to rescind a fraudulent sale of a barber-shop in which it was alleged that Dennison represented that the shop would earn from $5 to $10 a day above expenses; that such representations were false and were made to defraud; that Koehler ''relying thereon was induced to pay the sum stated for the property''; and it is then alleged that instead of clearing $5 to $10, a day, ''he lost from $10 to $15 a week.'' The opinion says:

''The plaintiff was somewhat tardy in offering to return the property, but when it is kept in mind that he was trying to realize the profits represented, which could not at once be determined, the delay in demonstrating the experiment was not unreasonable.''

Although it does not appear from the opinion itself when, if ever, the notice to rescind was given, the syllabus says:

"A delay of six weeks by the purchaser of a barbershop, before offering to return the property, during which time he was trying to realize the profits which the seller and broker represented to him would be made, was not unreasonable."

The case was heard *in banc.* Although there was a vigorous dissent opinion by one Justice, concurred in by another, on the point involved here the opinion of the court was approved by the other five Justices. In Black on Rescission and Cancellation, Volume 2, Section 536, it is said:

"In order to escape the imputation of laches in this matter, it is necessary for him (according to the various expressions used in the decisions) to act 'promptly,' 'with reasonable promptness,' 'with due diligence,' or at least 'within a reasonable time' after discovering the facts on which his claim to rescind is based. It is probable that all these phrases, with reference to time, should be understood as substantially equivalent in meaning. * * And it is held that this means that he must not delay without adequate cause, and that he must proceed with his rescission and his offer of restoration with that measure of promptitude which the nature of the case and the environment or the circumstances require as manifesting an intention to treat what he has received under the contract as the property of the other party, and not as his own. * * It must be remembered that a contract induced by fraud, false representations, mistakes, etc., is not void but only voidable, and it is entirely within the right of the injured party to affirm it or treat it as valid and subsisting. In this respect he has a choice or election, and he should not be required to make his decision instantly. The true doctrine is that, after discovering the facts justifying rescission, the party is entitled to a reasonable time

in which to decide upon the course he will take. But this does not mean that he will be indulged in a vacillating or hesitating course of conduct, but that he must act with such a measure of promptness as can fairly be called 'reasonable' with reference to all the circumstances of the particular case. Particularly, he must, if possible, avoid such a delay as will make the ensuing rescission injurious to the other party or to the intervening interests of third persons. He must use reasonable diligence in ascertaining the facts which may entitle him to rescind, and must act so soon after the discovery of them as that the opposite party will not be unnecessarily prejudiced by the delay.''

Section 538: ''A right of action to rescind a contract for fraud, false representations, mistake, or other cause, does not accrue until the injured party acquires knowledge of the facts on which his claim for relief may be based. Hence accepting as established the rule that a right of rescission must be exercised with reasonable promptness, the time with reference to which the question of promptness must be determined is the time when the party discovered the facts entitling him to complain, and not the time when the contract was made.''

Section 541: ''Whether or not a person has been reasonably prompt in exercising the right to rescind a contract, or, on the other hand, whether he is chargeable with laches precluding relief, is a question which does not depend upon the lapse of time alone, but upon the lapse of time considered in connection with the nature of the contract, the situation of the adverse party, and all the circumstances of the particular case.''

Section 542: ''The purchaser of personal property who desires to rescind the sale on account of fraud, mistake, defective quality, or other cause, is required to act with reasonable promptness. It is of course impossible to fix an absolute limit of time within which such action must be taken, as each case must be governed by its own circumstances. But from an

examination of the authorities it would appear that thirty days is about the utmost length of time which the courts are disposed to allow to the purchaser for this purpose, unless there are unusual circumstances in the case excusing a longer delay."

Section 544: "So, also, when the contract was induced by false representations, the party having the right to rescind is not to be charged with laches in respect to any time which he spent in testing or trying the matter or in endeavoring to make the facts square with the representations. * * Old age, physical or mental weakness, ignorance, and inexperience are also matters which may be pleaded with greater or less effect as explaining or excusing the want of prompt action in disaffirming or rescinding a deed or contract."

Section 546: "The defense of laches, interposed to defeat the right to rescind a contract for fraud or other sufficient cause, should not be entertained unless it is made to appear that it would be inequitable to deny it, and while one seeking to rescind is ordinarily required to act with reasonable promptness, a liberal extension of this rule is allowable where the delay has not been willful nor exercised for an unfair purpose. * * Thus, the right of a vendor of personalty to rescind the contract will not be lost, as between the parties, by a delay in its exercise which is not indicative of an election not to rescind and which is not to the injury of the opposite party."

Section 547: "The rule being well established that a party seeking to rescind a contract must take the proper steps in that behalf with reasonable promptness after discovering the facts which entitle him to rescind, or within a reasonable time, the question of what constitutes a 'reasonable time' for this purpose is sometimes said to be a mixed question of law and fact, the lapse of time being for the court. But the more generally accepted rule is that the question must be left to the determination of the jury if the facts are in dispute, or if its determination must depend upon matters put in evidence, such as the

nature or uses of the property in question, any usages or customs of the trade, the motives of the parties, the truth of matters alleged in excuse or explanation of the delay or other circumstances. * * But on the other hand, where there is no dispute as to the facts, the question whether or not the rescinding party acted with due promptness, or within a reasonable time, is one of law for the decision of the court. * * Such a decision of the question by the court is warranted where it can be said that, under no circumstances appearing in the evidence, would the jury be justified in finding that the rescission was claimed within a reasonable time, where the delay was so long that no question as to its reasonableness could arise as to which fair-minded men might differ, where the delay was 'palpably' unreasonable, where the delay was for such a period of time as to be unquestionably without cause or excuse, and where there is no evidence whatever to show that so long a delay was necessary to the rescinding party.''

Ruling Case Law, Volume 24, Section 646, says:

"And since a sale is voidable only at the option of the buyer, to entitle him to rescind he must act promptly on the discovery of the fraud, and if after discovering the fraud, he acquiesces in the sale either by express words or by an unequivocal act or unreasonable delay he will be deemed to have affirmed the sale and he cannot afterwards rescind. * * * A purchaser of a business who, within a week, discovers that the sale was fraudulent and offers to rescind, and, on refusal, tests the matter further for two months, and then makes an absolute rescission, is not guilty of unwarrantable delay in rescinding the sale.''

In *Clark* v. *Wells,* 127 Minn. 353 (149 N. W. 547, L. R. A. 1916F, 476), decided by the Supreme Court of Minnesota, the syllabus says:

"The party who rescinds a contract on the ground of fraud must, as a general rule, place the other party *in statu quo* by returning what he received; but 'the

party guilty of the fraud is not entitled to anything more than substantial justice, and a fair opportunity to receive what he parted with.' If, through the fault of the wrongdoer, the party defrauded is unable to return all the property received in the condition in which he received it, it is sufficient, if he restore the property so far as he is able, and secure to the wrongdoer the equivalent of what cannot be returned."

In Page on Contracts, Volume 1, Section 352, it is said:

"The fact that one who has bought a going business has sold a part of the stock, does not prevent him from obtaining rescission for fraud if he tenders such of the stock as is left, together with his profits thereon, and offers to make compensation for such part of the stock as has been sold."

1. The stock purchased was small, and to keep the business a going concern, in the very nature of things it would have to be replenished as daily sales were made. Defendant knew that the plaintiff purchased the business for the purpose of continuing it and she was not injured in the least because he did purchase new stock and mingled it with the old. That was necessary to conduct and maintain the business. There is ample evidence from which the jury could find that the plaintiff was defrauded. He had but little, if any, business experience and did not know anything about the millinery business and had nothing to do with the actual conduct of it after the purchase was made.

2, 3. It is not only the right, but it is the duty of the court to sustain a motion for a directed verdict in a proper case, yet where there is competent evidence to sustain a verdict, the case should be submitted to the jury. Under all the facts and circumstances surrounding the instant case, we cannot say,

as a matter of law, that a delay of thirteen days before giving the notice to rescind after the discovery of the fraud was unreasonable.

Upon the question here presented we do not attach any importance of the lease. The plaintiff testified that it was not assigned or delivered to him, and the defendant ignored the notice to rescind and testified that the transaction was an absolute sale and made in good faith. The plaintiff tendered the fixtures and all the unsold portion of the stock and offered to account for all of the stock which had been sold. The case should have been submitted to the jury. The judgment is reversed and remanded.

REVERSED AND REMANDED.

BEAN, BROWN and HARRIS, JJ., concur.