Gerald L. BOOTHE, Plaintiff,

v.

BAKER INDUSTRIES, INC., et al.,
Defendants.

Civ. A. No. 2945.

United States District Court
D. Delaware.

Dec. 9, 1966.

Irving Morris and Joseph A. Rosenthal, Cohen, Morris & Rosenthal, Wilmington, Del., Nathan B. Kogan. New York City, of counsel, for plaintiff.

Aubrey B. Lank, Theisen & Lank, Wilmington, Del., Milton Pollack, New York. City, of counsel, for defendants Baker Industries, Inc. and Solomon R. Baker.

Clair John Killoran and E. Dickinson Griffenberg, Jr., Killoran & Van Brunt, Wilmington, Del., John R. Hupper and Howard G. Kristol, Cravath, Swaine & Moore, New York City, of counsel, for defendants Universal American Corpora-

tion, Harry E. Gould, Francis S. Levien, Norman L. Spelke, and Paul Hardeman (individually).

S. Samuel Arsht and David A. Drexler, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Beekman & Bogue, New York City, of counsel, for defendant Hemphill, Noyes & Co.

David F. Anderson, Berl, Potter & Anderson, Wilmington, Del., for defendant Paul Hardeman, Inc.

## OPINION

STEEL, District Judge.

All of the defendants have moved for summary judgment dismissing the Complaint upon the ground that a final judgment rendered by the Supreme Court of New York on November 30, 1964 in the case of Hoffman v. Young Spring & Wire Corporation, et al is a bar to the maintenance of the present action. There is no issue of any relevant fact and the resolution of the motion depends solely upon questions of law.

The instant action is brought by plaintiff, a stockholder of Paul Hardeman, Inc., a Michigan corporation,[1] against (a) that corporation, (b) one group of individuals and Baker Industries, Inc. (the Baker group), (c) another group of individuals and Universal American Corporation (the Universal group), (d) and an investment banking firm, Hemphill, Noyes & Co. (Hemphill). Jurisdiction under Counts I and II is based upon § 27 of the Securities Exchange Act of 1934, (15 U.S.C. § 78aa), 28 U.S.C. § 1331 (federal question), and § 1337 (regulation of commerce). Both counts charge violations by defendants, or some of them, of § 10(b) and Rule 10 b–5 thereunder making it illegal to perpetrate a fraud in the

purchase or sale of securities, and § 14 (a) and Rule 14 a–9 thereunder making it illegal to solicit proxies by means of a proxy statement containing false and misleading statements. Count III alleges violations of fiduciary obligations under the common law and is brought in this Court upon the theory of pendent jurisdiction.

Both Counts II and III seek derivative relief on behalf of Young. At the argument plaintiff's attorney agreed that the maintenance of these counts is barred under principles of *res judicata* by the judgment entered in the *Hoffman* action, and an order dismissing Counts II and III has been entered. This leaves Count I for disposition.

The allegations of Count I, in summary, are as follows:

In the summer of 1963, Universal American Corporation (Universal), one of the Universal group, owned directly and indirectly 80.5% of Hardeman and controlled its policies (¶ 12). At the same time, Baker Industries, Inc. (Baker), one of the Baker group, was the beneficial owner of 49% of the outstanding stock of Young, and was able to and did elect its Board of Directors (¶ 14.)

In June 1963, at the suggestion of Hemphill, Universal became interested in acquiring control of Young so as to combine it with Hardeman. At about the same time the Baker group, through Hemphill, became interested in selling stock of Young owned by Baker either to Universal or to its subsidiary, Hardeman (¶ 13).

Under a plan conceived by the Baker group, Baker determined to sell the directorships of Young by selling at a premium price its stock in Young, thereby obtaining a substantial profit for it-

---

[1.] Paul Hardeman, Inc., the Michigan corporation, is the present name of the surviving corporation of a merger effective on or about April 30, 1964 between Paul Hardeman, Inc., a Delaware corporation, and Young Spring & Wire Corporation, a Michigan corporation. The surviving Michigan corporation, Young Spring & Wire Corporation, immediately upon the merger changed its name to Paul Harde-

man, Inc. Throughout this opinion Paul Hardeman, Inc., the Delaware corporation, will be referred to · as Hardeman and Paul Hardeman, Inc., the Michigan corporation, as well as Young Spring & Wire Corporation, will be referred to as Young, unless the context requires that the full name be used for purposes of clarification.

self, but not for the minority stockholders of Young, in derogation of the fiduciary duty which Baker as a controlling stockholder, and other members of the Baker group as officers and directors of Young, owed to its minority stockholders (¶ 15). For its part, the Universal group determined to acquire control of Young from Baker, and thereafter to merge Young and Hardeman so that Hardeman could acquire from Young, which was in a strong financial position, substantial working capital which Hardeman desperately needed (¶ 16, 17).

The merger of Hardeman and Young was an "essential step" in the plan of the Universal group not only to secure for Hardeman the quick assets of Young, but also to foist upon Young the loans incurred by Hardeman to secure funds to pay for the Young stock (of which more hereafter) necessary to effectuate the merger. To carry out the plan it was necessary for the Baker group to cooperate actively with the Universal group. Accordingly, the Baker group helped negotiate the acquisition by Hardeman of shares of Young stock in addition to those which Hardeman bought from Baker, and they contributed at least $100,000 toward the purchase price. Without assurance that it could effectuate a merger of Hardeman and Young, the Universal group was unwilling to commit Hardeman to buying the Young stock owned by Baker (¶ 18).

The plans of the Baker and Universal groups were carried out through the following actions:

On August 28, 1963 Hardeman and Baker entered a contract under which Hardeman agreed to purchase and Baker to sell the Young stock owned by Baker for $42 per share, despite the fact its price on the New York Stock Exchange was only $30 a share, thus enabling Baker to receive a premium of $12 per share, or a total premium of $2,171,220 (¶ 19(a)).

On September 20, 1963 Hardeman made a down payment to Baker of $1,-500,000 with funds which Hardeman borrowed for the purpose. At the same time Hardeman gave Baker a promissory note due September 23, 1964 for $6,099,-270 for the balance of the purchase price. Although the note was secured by the Young stock, Baker granted full voting rights of the stock to Hardeman immediately (¶ 19(b)-(d)).

On October 21, 1963 the Universal group caused Young to issue a proxy statement for the annual meeting of stockholders to be held on November 19, 1963. At that meeting a board of directors consisting of eight members was elected, six being Hardeman nominees and two being Baker's nominees. The Hardeman nominees were all persons who were directors of Hardeman and Universal. Baker's nominees were elected to protect Baker pending the time when the purchase price of the Young stock had been paid in full (¶ 19(e), (g)). At the meeting, one of the individuals in the Universal group denied any intention to merge Hardeman and Young or to use Young's money to pay the balance of the Hardeman debt incurred to buy the Young stock (¶ 19(g)).

Prior to the August 28, 1963 agreement between Hardeman and Baker, Universal had obtained a commitment from Hemphill to form an underwriting group to distribute $7,000,000 of Hardeman debentures. In December of 1963 the commitment was carried out by the issuance by Hardeman of $7,000,000 of 5½% convertible subordinated debentures, due December 1, 1978 (¶ 19(h)).

During the period September 20, 1963 to December 31, 1963 the Universal group, through Hardeman, with the active cooperation of the Baker group, secured agreements under which it purchased 34,505 additional shares of Young stock at $37 a share. This was substantially more than the market price. The Baker group paid $2.50 a share toward the purchase price of these shares. Acquisition of these shares gave Hardeman over 58% of the Young stock entitled to vote on a merger (¶ 19(i)).

Early in January of 1964, Hardeman used a part of the proceeds which it received from the sale of debentures to pay the remaining amount which it owed

Baker, and used the balance of the proceeds to reduce the $1,500,000 loan which Hardeman had made to make the down payment to Baker in September of 1963. Thereupon, the two Baker representatives on Young's board resigned (¶ 19 (j)).

In January of 1964, the Universal group, having control of better than 80% of Hardeman's stock and through Hardeman better than 58% of Young's stock, went forward with "the final step in the plan, namely, merger of Hardeman and Young." To this end, the Universal group had Young engage the services of Hemphill to suggest terms of exchange fair to both Hardeman and Young (¶ 19 (k) and (l)). The stockholders of both Hardeman and Young voted in favor of the merger, and it was carried out (¶ 19(o)). As the surviving corporation, Young assumed the liabilities of Hardeman. These included the liabilities incurred by Hardeman in order to raise money to pay for the Young shares it bought from Baker and other Young stockholders (¶ 19(p)).

In connection with the transactions referred to, Hemphill received substantial finder's fees for the part which it played in bringing the parties together, as well as substantial underwriting fees in marketing the Hardeman debentures (¶ 19(h)).

The Complaint further alleges that in order to carry out their plans the defendants by use of the mails and other instrumentalities of interstate commerce solicited proxies for the annual meeting of stockholders of Young by a proxy statement dated October 21, 1963, and for the stockholder's meeting at which the merger was voted upon, by a proxy statement dated March 27, 1964. It is alleged that in wilful violation of § 10(b) and 14(a) of the Act and Rules 10b-5 and 14a-9 thereunder, the proxy statements contained materially false and misleading statements and omissions of fact in a number of specified respects, including particularly their failure to disclose the plans of the Universal and Baker groups and the steps taken thereunder as hereinabove detailed (¶ 20).

The Complaint contains no charge that the terms of the merger agreement were unfair. Nevertheless, the Complaint does allege that the merger and all contracts made pursuant thereto are void under § 29(b) of the Act, (¶ 21), and that because of the Securities Act violations Young, plaintiff and all other members of the class similarly situated, were severely damaged and the defendants have illegally profited (¶ 22).

These allegations reasonably support the conclusion, expressed by defendants' attorney and the Court at the argument, that the gravamen of the Complaint is that Young and its stockholders were injured by the merger because its terms were unfair to Young, and that votes favoring the merger were obtained by a proxy statement which contained misrepresentations and material omissions in violation of the Securities Act. At the argument, however, plaintiff's attorney disavowed any intention to challenge the fairness of the merger. He said:

"Our contention is that the stockholder was induced to accept the terms of the merger which on their face are fair. We do not attack the exchange ratio, and deliberately so."

While the theory of plaintiff's case, as expounded at the argument, is somewhat obscure, it would seem that plaintiff is claiming that the misleading character of the proxy statement deprived plaintiff and other minority stockholders of Young of the opportunity to make an informed choice whether to keep their stock, sell their stock, or seek an appraisal under Michigan law, and therefore they are entitled to recover damages presumably equal to the decline in the market price of their stock since the merger. Even upon this theory, it is difficult to escape the conclusion that the alleged misstatements in the proxy statements and the merger allegedly carried out by reason thereof lie at the heart of the plaintiff's case.

The *Hoffman* action in New York involved substantially the same series of

transactions as does the instant one. In it there were three primary points in issue: (1) whether the proxy statement of Young, dated March 27, 1964, contained false and misleading statements and omissions; (2) whether the merger between Hardeman and Young was unfair to Young and its stockholders because the exchange ratio was inequitable; and (3) whether a management contract between Universal and Hardeman which was assumed by Young after the merger, was unfair to Young and to its stockholders.

After depositions had been taken and discovery had been proceeded with by Hoffman, a stipulation of settlement was entered into, subject to Court approval, providing that Universal and Young would enter into an agreement under which, so long as Universal continued to control Young, Universal would render to Young without cost the same management and servicing activities which it had theretofore rendered to Hardeman for a fee of $50,000 a year. The stipulation also provided:

"(a) The entry of a judgment in this action approving the execution and delivery by Universal to Hardeman of an agreement in the form annexed hereto as Exhibit "A" as a fair, adequate and reasonable settlement of all of the claims asserted in the complaint herein, or which might be asserted thereunder, including, without limitation, any claim questioning the validity or fairness of the merger referred to in said complaint and the validity of the proxies solicited and used in connection with said merger, directing the consummation of this settlement and directing the dismissal of the complaint herein on the merits against all of the defendants therein named with prejudice to Young and all of its shareholders."

Upon the filing of the stipulation of settlement, the Court appointed a Referee to inquire into the merits of the action, and to ascertain the fairness, adequacy and propriety of the proposed settlement. Following a hearing at which transcripts of the examinations before trial of two of the defendants and 113 exhibits were received in evidence, the Referee filed a 33-page report in which he recommended that the proposed settlement be approved and confirmed. The Referee found specifically, among other things, that the ratio of exchange provided in the merger agreement was in every respect fair (and perhaps more than fair) to Young and its stockholders, and that the proxy statement which Young sent to shareholders in connection with the merger fully and comprehensively informed the shareholders of every pertinent and material fact. Thereafter, a hearing was held by the Court, after due notice to all stockholders of record, to determine whether the proposed settlement should be approved by the Court. No stockholder appeared to object to the settlement. On November 30, 1964, the Court entered a judgment confirming the report of the Referee, adopting the report as its opinion and decision, and adjudicating that the settlement was fair, adequate and reasonable and should be consummated. The judgment further provided that it was:

"ORDERED AND ADJUDGED that execution and delivery of an agreement by defendant Universal American Corporation to defendant Paul Hardeman, Inc. in the form annexed to the Stipulation of Settlement as Exhibit A thereto is approved and shall be full and final discharge of all claims asserted in the complaint herein, or which might be asserted thereunder, including, without limitation, any claim questioning the validity or fairness of the merger referred to in the said complaint or the validity of the proxies solicited and used in connection with the said merger or the validity of the proxy statement used in connection with said merger; and it is further

ORDERED AND ADJUDGED that the complaint in the above entitled action be, and the same hereby is, dismissed on the merits, without costs, against all of the defendants therein named and with prejudice to Paul

Hardeman, Inc. (formerly known as Young Spring & Wire Corporation) and all of its stockholders. * * *"

No appeal having been taken, the judgment became final.

■ The full faith and credit clause of the United States Constitution, Article IV, § 1, and the implementing statute, 28 U.S.C. § 1738, require that this Court accord the *Hoffman* judgment the same force and effect that it would have in the courts of New York.

The effect of a prior judgment in New York upon a later proceeding in that state has been stated in Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp., 250 N.Y. 304, 165 N.E. 456 (1929). There the Court said at pp. 457–458 of 165 N.E.:

"A judgment in one action is conclusive in a later one, not only as to any matters actually litigated therein, but also as to any that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established in the first [Citations]. It is not conclusive, however, to the same extent when the two causes of action are different, not in form only [Citation], but in the rights and interests affected. The estoppel is limited in such circumstances to the point actually determined [Citation].

" * * *

"The decisive test is this, whether the substance of the rights or interests established in the first action will be destroyed or impaired by the prosecution of the second. An estoppel is not avoided in such circumstances by mere differences of form between the one action and the other [Citations]."

The plaintiff concedes that the *Hoffman* judgment would be a bar to the prosecution of his action if the latter were derivative as he claims the *Hoffman* suit was.[2] Plaintiff asserts, however, that his action was brought as a class action, and under the law of New York a judgment rendered in a derivative suit creates no estoppel against the prosecution of a non-derivative class action.

An examination of Count I discloses that plaintiff intended to allege at least in part a derivative cause of action. Although he does not allege the efforts which he made to induce Young to bring the action, or why he failed to do so, as Rule 23 (as it existed when suit was brought) required prior to the institution of a derivative action, nevertheless the Complaint does contain other allegations indicating a desire on plaintiff's part to secure derivative relief running to Young. Thus, paragraph 1 alleges that the plaintiff has been a stockholder at the times of the transactions of which he complains, as Rule 23(b) required.[3] Paragraph 3 alleges that the action is brought "derivatively on behalf of Young;" and paragraph 22 alleges that by reason of the violations of the Act "Young * * * [has] been severely damaged." Prayer (c) asks that the defendants other than Young jointly and severally account to Young. These prayers are not restricted to Count II which admittedly alleges a derivative cause of action. They appear at the end of both Counts I and II and seemingly are applicable to each.

On the other hand, Count I contains allegations indicating an intention on plaintiff's part to sue in a non-derivative individual and representative capacity. Paragraph 2 alleges that the action is brought individually and as representative of all of the stockholders of Young similarly situated; and paragraph 22 alleges that because of the violations of the Securities Act of 1934, "plaintiff and all other members of the class similarly situated have been severely damaged and the defendants have illegally profited." It may be assumed that prayer (b) seeking an award of damages growing out of violations of the Act was intended to ask

2. The attorney for the Universal Group asserts that the *Hoffman* action was "at least" derivative.

3. Consistent with that Rule, the complaint is verified.

for damages running to plaintiff individually and to other members of his class, rather than to Young, in view of the fact that prayer (c) expressly asks that the defendants account to Young.[4]

■ Count I therefore presents the anomaly of purporting to allege both a derivative action and a non-derivative class action. Ordinarily the damage which a stockholder suffers from a merger accomplished through a deceptive proxy solicitation in violation of § 14(a) and the regulations thereunder, flows from damage done to the corporation rather than from damage inflicted directly upon the stockholder. Nonetheless, in the circumstances stated, a right of action under the Act exists as to both derivative and non-derivative causes. J. I. Case Co. v. Borak, 377 U.S. 426, 431, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).[5]

■ But even if Count I is interpreted to allege in part a non-derivative class action, and in this respect is based upon a theory different from the derivative action pleaded by Hoffman, still the Hoffman judgment requires that plaintiff's suit be dismissed. Two points were actually litigated and determined in Hoffman: (1) the validity of the proxy statement dated March 27, 1964, and (2) the fairness of the merger. The report of the Referee, which was expressly adopted as the opinion and decision of the Court, stated:

"Specifically, I find the ratio of exchange on the merger was fair and the proxy statement was full and complete."

In the face of the adjudication in Hoffman of these two issues, this Court could not possibly find a violation of either section 10(b) or 14(a) and related rules without cutting the heart out of the Hoffman judgment.

Plaintiff's contention that under New York law a judgment for a defendant in a stockholder's derivative action cannot be pleaded in bar to a stockholder's non-derivative class action based upon the same transactions, rests upon the New York cases of Harris v. Pearsall, 116 Misc. 366, 190 N.Y.S. 61, 73 (Sup.Ct. 1921), appeal dismissed, 202 App.Div. 785, 194 N.Y.S. 942 (1922); Williamson v. Casa-Eguia, 226 App.Div. 195, 234 N.Y.S. 449 (1929), rev'd on other grounds 253 N.Y. 41, 170 N.E. 486 (1930); and Dana v. Morgan, 232 F. 85 (2d Cir. 1916); and the so-called general rule stated in Liken v. Shaffer, 64 F. Supp. 432, 454 (N.D.Iowa 1946). Apart from any other distinctions which may exist between the cited cases and the instant one, it is enough to point out that judgments pleaded in bar in the cited cases do not in terms begin to have the comprehensive reach of the Hoffman judgment.

Its terms can only mean that the merger and proxy statement were intended to be protected from further attack by Young or by any of its stockholders regardless of the form of action in which the attack might be cast. It is inconceivable that Universal would have surrendered its right to receive $50,000 per year in perpetuity under its management contract with Hardeman (assumed by Young) unless Young and its stockholders were barred once and for all from relitigating the transactions which were the subject of the Hoffman suit. It is reasonable to believe, therefore, that a New York court would give the Hoffman judgment its intended effect if the present action were in New York.

---

4. Whether prayer (d) seeks derivative or representative relief is ambiguous.

5. Compare Simon v. New Haven Board & Carton Co., 250 F.Supp. 297 (D.Conn. 1966). There the Court sustained the right of a stockholder in New Haven to bring a derivative action under § 10(b) of the Act and related regulations claiming that the directors of New Haven had caused it to issue stock in a merger for an inadequate consideration, and that stockholders' approval had been obtained by false and misleading proxy statements. The Court rejected defendants' contention that at most the transaction might support an individual stockholder's cause of action. 250 F.Supp. 299.

There is no reason of public policy why a final judgment such as was entered in the *Hoffman* case should not bar further action by a stockholder attacking the same transactions whether by means of a derivative, non-derivative, or individual suit, where the prior judgment fairly interpreted, purports to do so, as does the *Hoffman* judgment. Indeed, the desirability of ending litigation once and for all supports the view that the principle of *res judicata,* or at least the narrower principle of estoppel by judgment as to matters actually litigated and decided, should be applied.

Plaintiff's position has nothing to recommend it. With full opportunity to appear in New York and demonstrate the inequity, if any there was, of the proposed settlement and judgment to be entered in the *Hoffman* case, plaintiff chose instead to bring his present action two weeks after notice of the New York hearing had been mailed and five days before the hearing in New York took place.

Count I will be dismissed.