Waldorf C. EYMAN (a/k/a W. C. Eyman) Trustee under Deed of Trust executed under date of December 1, 1965, by Charles E. Wilson as Grantor and W. C. Eyman as Trustee, and Charles E. Wilson, Plaintiffs,

v.

MARSHA DEVELOPMENT CORP., a corporation, Henry J. Richter & Co., a corporation, and Robert R. Ruppert, Defendants.

No. 67 C 359(1).

United States District Court

E. D. Missouri, E. D.

June 26, 1969.

————◆————

Lowenhaupt, Chasnoff, Freeman & Holland, Hyman G. Stein and Charles Alan Seigel, St. Louis, Mo., for plaintiffs.

Jerome F. Raskas, Daniel, Raskas, Ruthmeyer & Schneider, St. Louis, Mo., for Marsha Development Corp. and Robert Ruppert.

Theodore D. Ponfil and Harold L. Satz, St. Louis, Mo., for Henry J. Richter & Co.

## MEMORANDUM OPINION

HARPER, Chief Judge.

The plaintiffs herein have filed a three-count complaint seeking certain monetary and other statutory relief. Jurisdiction is founded upon diversity of citizenship under 28 U.S.C.A. § 1332 and upon the provisions of 15 U.S.C.A. § 77a et seq., The Securities Act of 1933.

For the purpose of this decision, the pertinent testimony and exhibits disclose that the plaintiff, Charles E. Wilson, on December 1, 1965, executed a formal instrument purporting to create an irrevocable ten-year income tax trust. The plaintiff Eyman was to be the trustee under the terms of that instrument. Said trust was to have a life of 121 months, at which time the property was to revert to Wilson, or if he were deceased, to his wife. Wilson's wife was the primary income beneficiary of the trust.

Following an extended period of negotiations between Wilson and Ruppert, Wilson paid to the Marsha Development Corporation (Marsha) the sum of $30,-000.00, in return for which Marsha agreed to convey to Eyman as trustee, a one-half working interest in certain oil leases and further to give an option on certain other oil leases. It is this transaction, and more particularly the events leading up to it, which form the factual basis for this suit.

Count One alleges certain violations of the Securities Act of 1933 and seeks the remedy provided by section 77l thereof.

Count Two alleges a common law action for fraud and misrepresentation and requests actual and punitive damages.

Count Three alleges violations of the Missouri Securities Act, Chapter 409, RSMo 1959, as amended, V.A.M.S.

At the conclusion of the trial on the merits, the plaintiffs filed a motion to amend the complaint to conform to the evidence, urging that the evidence presented therein established a violation of section 10 of the Securities Exchange Act of 1934 and more specifically a violation of rule 10 B 5 promulgated thereunder. Plaintiffs urge that federal case law decisions have established a private remedy for proven violations of said rule. Said motion was granted by this court's order of June 25, 1969.

Having fully considered the matter, it is the opinion of this court that the plaintiffs here are not entitled to maintain this action by reason of a prior suit which went to final judgment in the

United States District Court for the Western District of Kentucky.

On January 13, 1967, plaintiff Wilson instituted an action, being Cause No. 2176, in the Western District of Kentucky, against the defendants Marsha and Ruppert. His complaint in that suit alleges that the defendants entered into a written agreement, denominated a "Joint Venture Agreement" (Defendants' Exhibit 1), with Eyman, "as Trustee for the use and benefit of plaintiff and with plaintiff," whereby for $30,000.00 paid by Wilson, Eyman was to get the one-half working interest and an option for the purchase of one-half of an additional lease or set of leases. The oil lease in question in this action is the same one which was the subject matter of the Kentucky litigation. Wilson continued to affirmatively urge the validity of the Joint Venture Agreement and sought specific performance thereof. He prayed for an order requiring Marsha to make formal assignment of the one-half working interest, and further for an order requiring Marsha to recognize Wilson's acceptance of the option.

On October 16, 1967, final judgment was entered. That order (Part Five of Defendants' Exhibit L) affirmed the validity of the contract (agreement) and ordered the formal assignment to be made, but denied specific performance of the option clause on an unrelated factual basis. No appeal was taken from this order and judgment. Thereafter, Wilson sought to amend his complaint to seek recision (the remedy provided by 15 U.S.C.A. § 77l), but leave to so amend was denied, from which order again no appeal was taken (Defendants' Exhibit L). It is important to note that at the onset of this litigation in Kentucky, Wilson filed lis pendens against all of the oil leases involved. It is clear from the uncontroverted evidence that such action had debilitating effects on Marsha and that several potential buyers of the leases were discouraged from pursuing any purchase talks. To place the effect of the lis pendens in context, at this time there was in southern Illinois and northwest Kentucky an oil boom in progress. Several new wells had come in and there was much new prospecting and investment activity taking place.

The evidence presented at the trial of this present cause reveals that at the time of the filing of the Kentucky litigation Wilson had full knowledge of all of the relevant facts upon which this present suit is predicated. Further, it is apparent that as soon as three to four weeks after having executed the Joint Venture Agreement, and certainly no later than two to three weeks after the filing of the Kentucky suit, Wilson firmly believed that he had been defrauded (Wilson's Deposition, pp. 150–53 and 157–58).

This summary constitutes the basic factual setting leading up to the action of Wilson and Eyman in filing this suit. It is obvious that basic equitable principles mitigate against the maintenance of this suit. In bringing such action, Wilson is reversing his legal allegations arising from the same facts previously existing and of which he had knowledge. The prior action presumptively caused the defendant Marsha damage by virtue of the lis pendens which restricted its ability to deal in its oil lease properties during the very height of the investment speculation in the area.

Professor Moore succintly states what this court finds to be the applicable principle of law (Vol. 1B, at page 764, par. 0.405):

"One fraudulently induced into a contract, for instance, may, as a matter of substantive law, either affirm or disaffirm the agreement. An election of the substantive right to affirm extinguishes the substantive right to disaffirm. And so an attempt to invoke the remedy of recision after an action on the contract may fail, not because of election of inconsistent remedies, but because the plaintiff no longer has the substantive right to disaffirm."

■ This is the precise situation in which Wilson finds himself. He has by means of the institution and maintenance of the Kentucky litigation affirmed the contract with full knowledge of the facts, and having done so is now precluded from asserting the contrary. Whether the label of res judicata, collateral estoppel, estoppel by judgment, election of inconsistent remedies, or some other label is applied to describe the situation, the result must be the same. The validity and finality of the Kentucky judgment must be sustained. To rule in any other manner would cut the heart out of that judgment and render it a nullity.

As to the second and third counts of this suit, Professor Moore's statement is clearly applicable. See, e. g., Dalton v. Dabbas, Mo., 276 S.W.2d 150; Nelson v. Swing-a-Way Mfg. Co., 8 Cir., 266 F.2d 184; Inland Waterways Corp. v. Doyle, 8 Cir., 204 F.2d 874, 879; Berger v. Mercantile Trust Co., Mo., 352 S.W.2d 644; United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261 (Brandeis, J., dissenting); Boothe v. Baker Industries, Inc., D.C., 262 F. Supp. 168.

A greater problem exists as to the first count, as amended, arising under the Securities Acts of 1933 and 1934. Plaintiffs argue with some force that the private remedial aspects of the 1933 act (and by inference the case law created rule 10 B 5 action) are not subject to these types of basically equitable defenses. There is a good deal of logic in that general proposition for these acts, particularly that of 1933, were designed to protect the investor from his own folly. Great reliance is placed upon Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L. Ed. 168. In that case, the Supreme Court held that an arbitration provision contained in the contract of sale was invalid and unenforceable under the 1933 act. Speaking of the rights of investors formulated under that Act, the court stated: "Congress has forbidden a waiver of any of those rights." Similar language can be found in the two other cases relied on by the plaintiffs, Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2nd Cir.) and Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10th Cir.).

However, taken *in context*, this language and these cases are rather clearly distinguishable from the one at hand. *Wilko* dealt with a provision of the contract of sale itself which under the decision of the case was in whole in violation of the Securities Act of 1933, and therefore a portion of said illegal contract could not be said to waive any of the rights under that portion of the law which made the very contract illegal. Therefore, the court merely decided that one cannot by means of the contract of sale itself waive any of the remedial provisions of the 1933 Act. *Kaiser-Frazer* deals with the prospectus requirements of the Act, and in context is totally inapplicable to the present situation. *Can-Am Petroleum* merely holds that one party's own culpability does not waive or bar his action where the other party is more culpable, and again in context is not therefore authority for the plaintiffs' proposition. Where the waiver or asserted bar urged is part of the transaction sought to be voided, these cases might prevent such a defense. Here the situation is different, for here the action urged as a defense and bar occurred after termination of the transaction involved and was independent of said transaction and further occurred at a time when the plaintiff Wilson was in full possession of the relevant and material facts.

There are at least two decisions which are in favor of the defendants' position. The first is Boothe v. Baker, supra, which held that res judicata was applicable to a suit under the 1934 Act and rule 10 B 5. The second is Straley v. Universal Uranium & Milling Corp., 9 Cir., 289 F.2d 370. In *Straley*, the court held the defense of laches inapplicable to the factual situation then existing and noted that the 1933 act contained what might

be a superceding statute of limitations. At page 373 the court stated:

"Such defenses (waiver and estoppel) are available to one against whom an action at law is brought on a contract declared voidable by common law. On principle, we see no reason why such defenses would not likewise be available to one against whom an action is brought on a contract declared voidable by judicial construction of a statute. There is nothing in the language of Section 77*l* or its legislative history to indicate that Congress intended to create a right enforceable in law or in equity not subject to defenses available at law or in equity to an action based on a voidable contract."

A study of the legislative history of both securities acts supports this conclusion.

 Therefore, this court must conclude that Wilson is clearly precluded from maintaining this present action against these defendants. Assuming for the purpose of this decision that the defendant, Henry J. Richter & Co., was in the control position alleged by the plaintiffs, such company would obviously be in privity with defendants Marsha and Ruppert and, therefore, is entitled to the benefits of this bar.

A more difficult situation exists in relation to Eyman, who sues here in his capacity as trustee, and who was not a party plaintiff in the Kentucky litigation. Plaintiffs urge that he (Eyman) alone holds the cause of action and that Wilson is merely a proper party. Further, plaintiffs assert that Eyman is not in privity with Wilson. Plaintiffs argue that it would be inequitable to rule otherwise, for this would in their opinion have the effect of depriving the income beneficiary of her day in court. In so arguing, plaintiffs overlook the fact that said beneficiary will have a clear remedy in the state court against the trustee and possibly Wilson for mismanagement of the trust.

As previously noted, Wilson, by formal instrument, purported to create a ten-year income tax trust on December 1, 1965, of which Eyman was the named trustee (Plaintiffs' Exhibit 1). Wilson's wife was the income beneficiary and a contingent remainder beneficiary. Paragraph 2 of said instrument provides that the trust consists of the property described in Schedule A "hereto annexed." Further, additional property may be added to the corpus when said property is added to the schedule. Plaintiffs' Exhibit 1 purports to be said trust. No Schedule A exists. No evidence demonstrates that the oil leases in question were ever part of Schedule A. In fact, from the evidence before the court, no trust res ever existed. Clearly at the time of execution, no trust property existed. This being the case, no present trust was created on December 1, 1965. Bogert, Trusts & Trustees, §§ 110–114 (2nd Edition).

Plaintiffs' Exhibit 3, a letter of June 6, 1966, from Eyman to Wilson, gives some further insight into the relationship of these parties. Referring to a telephone conversation, Eyman confirms Wilson's authority to sign commitments and acquisitions as agent of the trustee, and gives specific instructions as to the formal method of making such signatures.

On October 18, 1966, Wilson entered into the Joint Venture Agreement. He personally (not the trust) paid $30,000.00 for this one-half working interest and option. The face of the instrument shows that Eyman as trustee, is the buyer, and further in paragraph nine, provides that: "The parties hereto represent that they are authorized to execute this agreement on behalf of their respective parties." Wilson signed merely: "Charles E. Wilson." A supplemental letter agreement of November 17, 1966 (Plaintiffs' Exhibit 24, part A) is executed:

"Charles E. Wilson" (Handwritten signature)

"W. C. Eyman" (Typed) "Trustee" (Handprinted)

"By Charles E. Wilson" (Handprinted).

So at each execution, Wilson did not sign in the manner directed by Eyman in the letter of June 6th. Rather, he signed as if he were a party thereto (Res. Agency 2d 156).

Further light is cast upon this relationship by Wilson's deposition in the Kentucky litigation. (It must be remembered that his complaint clearly alleged that he was a party to this agreement, and the defendants' interpretation is entirely consistent with such an intention on Wilson's part.) Wilson stated in part: "He (Ruppert) wasn't to be the operator of the leases. Let's get that straight in a hurry. It was to be a joint transaction—joint operation." (Defendants' Exhibit G.) All of Wilson's actions and deeds, consistent with his background experience with other oil drilling concerns (Defendants' Exhibits A, B, C and D), his incredible testimony to the contrary notwithstanding, point to one conclusion: That Wilson intended to personally manage, operate and control these leases jointly with Ruppert. Indeed, Eyman testified that a trust such as the one purported to have been created is quite common when dealing with oil and has as its sole purpose a centralized place of receipt and disbursement of funds and royalties.

Thus, the following situation is shown to have existed:

1) Wilson is the settler of a purported trust of which Eyman is the purported trustee.

2) Eyman by the letter of June 6th confirmed an agency relationship with Wilson under which Wilson could sign Eyman's name when making acquisitions and commitments for the "trust".

3) Wilson made such an acquisition, but signed as if a party thereto.

4) The evidence conclusively points to Wilson's intent to be a party to said agreement and to operate the leases (jointly) while Eyman held legal title.

It is readily apparent that Wilson wore at the very least four hats: He was at the same time settler, agent of the trustee, remainderman of the trust, and a party to the Joint Venture Agreement. Eyman knew of and aided in the creation of this situation. Further, and of the utmost import, is the fact that Eyman knew of the Kentucky litigation, and though he testified that he had not specifically authorized it, he did nothing. This inaction resulted, in the court's opinion, because of Wilson's total control over the situation.

It is apparent to this court, removing the facade, that in substance, Wilson is and was the sole real party in interest. The "trust" is at best a paper tiger, while in the circumstances, it is more probably a mere sham. Eyman was in fact a mere nominee, holding legal title (at least for a term of years) while Wilson was to acquire, control and manage the property. With the failure of the instrument of December 1, 1965, to create a present trust for lack of a res, such a factual result is made more apparent. Under rule 17(a), Wilson is the real party in interest, and as such, properly instituted the prior litigation, and as such, bound Eyman, his privy, by such suit and its result. Under these facts, Eyman is clearly in privity with Wilson and is bound by that prior litigation. Wilson as settler-agent-party-remainderman had concurrent rights and interests in these leases.

In view of Wilson's exercised control, Eyman must under the facts here, be regarded as in privity. Therefore, Eyman is similarly barred by the Kentucky litigation from maintaining this present litigation.

The court adopts this memorandum opinion as its findings of fact and conclusions of law. The clerk will prepare and enter the proper order dismissing this action with prejudice for the reason that the plaintiffs thereto are barred from its maintenance by reason of prior litigation in the Western District of Kentucky as aforesaid.