GANNETT CO., INC.

v.

The REGISTER PUBLISHING COMPANY.

Civ. No. B–74–123.

United States District Court, D. Connecticut.

Feb. 7, 1977.

John S. McGeeney, Cummings & Lockwood, Stamford, Conn., for plaintiff.

Curtiss K. Thompson, Thompson, Weir & Barclay, New Haven, Conn., for defendant.

## RULING ON AVAILABILITY OF RESCISSION

NEWMAN, District Judge.

On October 20, 1976, the *Hartford Times* ceased publication. Its obituary notice stated that the paper had been "strangled by litigation." The controversy has not ended with its demise. The issue now pending

concerns whether Gannett Co., Inc. ("Gannett") or The Register Publishing Company ("the Register") owns what remains of the paper. In lawyer's language, the question is whether the Register is entitled to rescind the contract by which it agreed to purchase from Gannett more than 99% of the shares of The Hartford Times, Inc.

## I. INTRODUCTION

Prior to September 30, 1973, and for many years before that date, the *Hartford Times* had been owned and operated[1] by Gannett Co., Inc., a major publisher of newspapers in many cities across the country. After negotiations culminating in a closing on October 10, 1973, Gannett entered into a Purchase Agreement for the sale of the *Times* to The Register Publishing Company, which publishes two newspapers in New Haven, Connecticut. The Purchase Agreement provided that Gannett would sell its shares of the common stock of The Hartford Times, Inc. together with all outstanding stock of Community Offset, Inc. to the Register for an aggregate purchase price of $7,000,000, with appropriate adjustments in the purchase price to be made based on the difference between current assets and liabilities as reflected on the consolidated balance sheet to be prepared for the *Times*.

Shortly after the closing the Register became aware of discrepancies in the circulation statistics and financial statements of the *Times* as provided by Gannett. It learned of overvaluation of assets and of a series of devices that had been used for several years to conceal the reporting of inflated circulation figures. Consequently the Register decided not to pay Gannett the amount due under the net current asset adjustment provisions of the Purchase Agreement. Audits conducted over the next several weeks confirmed the Register's suspicions that the information supplied to it by Gannett prior to the execution of the

Purchase Agreement had been false and misleading in many respects.

Settlement negotiations began in December of 1973 and continued for some months with a view toward a resolution of the dispute between the Register and Gannett short of litigation. When these efforts fell through, Gannett filed this federal court action against the Register on April 15, 1974, for failure to pay the amount due under the net current asset adjustment provision. On June 12, 1974, the Register filed its counterclaim, alleging breach of contract, common law fraud, and securities law violations. In its counterclaim the Register sought compensatory and exemplary damages, or in the alternative, rescission of the Purchase Agreement and restitution of all benefits conferred by it on Gannett.

The present issue concerns the affirmative defenses Gannett has raised to the claim for rescission. Gannett has admitted for the limited purpose of obtaining a ruling on its affirmative defenses that:

> On October 10, 1973 facts and circumstances existed which both under the common law and under the provisions of the Securities Exchange Act of 1934 and S.E.C. Rule 10b–5 entitled The Register Publishing Company to rescind the Purchase Agreement between the parties dated October 10, 1973.

In effect, Gannett has demurred to the counterclaim and seeks an adjudication of its defenses to the rescission claim. The essence of the affirmative defenses is that regardless of the existence or extent of frauds rendering the contract voidable at the option of the Register, the Register's conduct since October 10, 1973, and the changes it has made in the operation of the *Times* bar the Register from seeking rescission. The Court held a severed trial on the affirmative defenses to rescission, and received extensive evidence on the disputed factual issues.[2] The parties have thorough-

1. Gannett owned 99,929 of the total 100,000 issued and outstanding shares of common stock of The Hartford Times, Inc., which published the *Hartford Times* in Hartford, Connecticut.

2. The factual issues have been substantially narrowed by the preparation of each side of proposed findings of fact, many of which were agreed to by the opposing side. Evidence was received only on the disputed findings.

ly briefed the legal issues bearing on the sufficiency of the affirmative defenses and the availability of rescission. After full and careful consideration, it is the conclusion of the Court that rescission is unavailable.

Prior to discussion of the controlling legal standards and the application of the facts to them, a pending motion should be considered. On May 21, 1976, almost two years after the filing of the counterclaim, the Register moved to amend its counterclaim to add claims under §§ 12(2) and 17 of the Securities Act of 1933, 15 U.S.C.A. §§ 77l(2) and 77q, and the Connecticut Securities Act, Conn.Gen.Stat. §§ 36–338 and 36–346. The original counterclaim had pleaded only breach of contract, common law fraud, and violation of § 10b of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission. Gannett has vigorously resisted the motion to amend on the grounds that the amendment would enlarge the Register's substantive rights to Gannett's prejudice at a time when the right to rescission granted by these statutes would ordinarily have terminated by virtue of the statute of limitations, and that the amendment would prejudicially inject vast new issues into the case and result in a waste of the efforts to date to narrow the trial issues.

For reasons that will become apparent after consideration of the causes of action the Register seeks to plead by this amended counterclaim, Gannett's fears are unwarranted. The defenses Gannett seeks to prove to prevent the Register from obtaining rescission are available under the new statutory sections as well. Thus the argument of prejudice evaporates. Further, the essential elements of the Register's cause of action under the new claims have all been in the case from the beginning. S.E.C. Rule 10b–5, pleaded in the original counterclaim, makes it unlawful in connection with the sale of any security

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . .

The wording of § 17 of the 1933 Act and § 36–338(a) of the Connecticut Act is substantially similar, and § 12(2) of the 1933 Act creates civil liability where a prospectus or oral communication in connection with the sale of a security "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." Clearly the allegations of the original counterclaim, which repeatedly refer to material falsifications and misleading statements and omissions, set forth a state of facts that can support the new causes of action as well.[3] No new transaction is involved, and no new discovery is necessary. Further, though Gannett argues that the amendment lacks the allegations necessary to supply jurisdiction under either the 1933 Act or the Connecticut Act, these jurisdictional prerequisites are implicit from a fair reading of the original counterclaim taken as a whole.[4] Accordingly, the motion to amend is granted.[5]

---

**3.** See Hitchcock v. deBruyne, 377 F.Supp. 1403, 1407 (D.Conn.1974), in which an amendment to allege a common law fraud cause of action was permitted where the original securities law complaint put the defendants on notice of the elements of a fraud claim.

**4.** Section 12(2) of the 1933 Act requires an allegation that the offer or sale of a security was effected "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails." The use of means or instrumentalities of inter-

state commerce was alleged in ¶ 28 of the original complaint.

Gannett argues that the Connecticut Securities Act claim is fatally defective without an allegation that the transaction involved a "sale" or "offer to sell" in Connecticut. It is not necessary to decide this issue for present purposes. Since, as will be shown more fully below, the availability of rescission is the same under the Connecticut Securities Act as und-

## II. LEGAL STANDARDS

A number of legal questions bear on the availability of rescission. These questions are analyzed in this Part prior to a full discussion of the facts in order to illuminate the significance of the facts adduced. The sections in this Part deal with the legal claims in turn, beginning with the breach of contract and common law fraud causes of action and proceeding to the causes of action derived from the federal and state securities regulation statutes. Then Part III will apply the legal principles to the facts as they have been developed at trial.

### A. *Breach of Contract and Common Law Fraud Claims*

██ Since jurisdiction over the common law contract and fraud claims is based on diversity of citizenship, this Court must apply to those claims the choice of law rules of the forum state, Connecticut. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Connecticut law will give effect to a good-faith stipulation of the parties to a contract selecting the substantive law to govern the interpretation and enforcement of their agreement. *Pollak v. Danbury Mfg. Co.*, 103 Conn. 553, 131 A. 426 (1925); *Fairfield Lease Corp. v. Pratt*, 6 Conn.Cir. 537, 278 A.2d 154 (1971); *Vending Credit Corp. v. Trudy Toys Co.*, 5 Conn.Cir. 629, 260 A.2d

135 (1969). The parties made such a stipulation in § 15(c) of the Purchase Agreement, which provides that "this Agreement shall be construed and governed by the Laws of the State of New York." By virtue of this provision, the substantive law of the State of New York governs the contract claims.[6]

██ New York law, like the law of most states, gives an injured party the option to rescind a contract induced by fraud. But the right does not persist indefinitely. New York law is very clear that the right to rescind for fraud must be exercised within a reasonable time after the injured party learns of the wrong.[7] If the injured party neglects to notify the other party promptly of his intention to rescind, or if he accepts benefits under the contract and thereby affirms it, he loses his right to rescind. *New York Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 26 N.E.2d 295 (1940); *Richard v. Credit Suisse*, 242 N.Y. 346, 152 N.E. 110 (1926); *Gravenhorst v. Zimmerman*, 236 N.Y. 22, 139 N.E. 766 (1923); *Soviero Bros. Contracting Corp. v. City of New York*, 286 App.Div. 435, 142 N.Y.S.2d 508 (1st Dept. 1955); *McNaught v. Equitable Life Assurance Soc'y*, 136 App.Div. 774, 121 N.Y.S. 447 (2d Dept. 1910); *Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.*, 64 Misc.2d 894, 315 N.Y.S.2d 897 (S.Ct. N.Y. Co. 1962); *Flamm v. Noble*, 43 N.Y.S.2d 922 (S.Ct. N.Y. Co. 1943), *aff'd*, 266 App.Div. 1001, 45

---

the federal acts, there is no present obstacle to granting the motion to amend. If Gannett wishes to defend against any damage claim based on the Connecticut Act on the ground that no sale or offer to sell took place in Connecticut, it will have a full opportunity at a later date. ·

5. Because of the holding that rescission is unavailable, it is unnecessary to consider Gannett's claim that the grant of rescission under the new statutory sections would require it as well to assume responsibility for the debts the Register incurred during the period it operated the *Times*. Whether these debts are proper elements of any damages eventually awarded the Register can be fully explored at a later date.

6. Gannett headquarters is located in Rochester, New York, and a large part of the negotiations culminating in the contract was conducted in New York. Thus the State of New York has a

substantial relationship to the parties and the transaction; and its local law (rather than the totality of its law including its own conflicts rules) will be applied to give effect to the parties' stipulation. Restatement (Second) of Conflict of Laws, § 187(3), comment h.

7. One New York case, *Richard v. Credit Suisse*, 242 N.Y. 346, 152 N.E. 110 (1926), clearly distinguishes between rescission for fraud, where notice of rescission must follow promptly upon discovery of the fraud, and rescission for abandonment. If the plaintiff wishes rescission because the defendant has abandoned the contract or is delaying unreasonably in his performance, the plaintiff can wait as long as he likes until his patience is exhausted before rescinding, as long as he brings suit within the statute of limitations.

N.Y.S.2d 413 (1st Dept. 1943). Restatement, Contracts, §§ 349, 480, 482, 483, 484.

> A party has a right to rescind a contract, where he was induced to enter into it by fraud; but he must do so promptly upon the discovery of the fraud, and cannot speculate as to whether it would be more profitable to affirm the contract or rescind it.

*Sarantides v. Williams, Belmont & Co., Inc.,* 180 N.Y.S. 741, 743 (S.Ct. App.Term 1920). In determining whether the injured party has lost the power to avoid the contract by delaying unreasonably in manifesting to the other party his intention to avoid the transaction, the speculative character of the contract is an influential factor. Restatement, Contracts, § 483. Comment (a) to this section of the Restatement states:

> But the injured party delays giving information of his intention at his peril. He cannot lie by and delay choosing whether avoidance or affirmance will be more profitable, especially if the contract relates to a speculative transaction.

It is somewhat misleading to think of the choice an injured party has to make between avoiding and affirming a contract in "election of remedies" terms.[8] The Register argues that under Rule 8 of the Federal Rules of Civil Procedure it is permitted to use alternative pleadings, and that there is nothing improper about its prayer in the alternative for damages or rescission in the counterclaim.[9] As a matter of pleading, this is true. But the real issue is not one of pleading but of substantive contract law. Professor Moore has distinguished "election of inconsistent remedies" from "instances where a choice, afforded by substantive law, terminated rights upon which the remedy invoked was dependent:"

> One fraudulently induced into a contract, for instance, may, as a matter of substantive law, either affirm or disaffirm the agreement. An election of the substantive right to affirm *extinguishes* the substantive right to disaffirm. And so an attempt to invoke the remedy of rescission after an action on the contract may fail, not because of election of inconsistent remedies, *but because the plaintiff no longer has the substantive right to disaffirm.* [emphasis added].

1B Moore's Federal Practice ¶ 0.405[7].[10] It is the substantive law of contracts that extinguishes the right, and not any doctrine of pleading.

Similarly, the use of "waiver" terminology only obscures whether affirmance or avoidance has taken place. The Register argues that unless it "waived" its rescission remedy in writing, rescission is available as a matter of law by virtue of § 15(d) of the Purchase Agreement, which reads:

> No waiver of any provision of this Agreement shall be effective unless in writing and similarly signed, nor shall any failure of any party to enforce any right or remedy hereunder be deemed a waiver of such right or remedy for the future in the same or any situation.

But if the Register affirmed the contract, then its right to rescind terminated by operation of law, regardless of whether it "waived" the right in writing.[11]

> The right to terminate in the face of a breach is only an option to declare the contract at an end; if the contract is continued, the party doing so has not,

---

**8.** The "election" terminology is frequently used, however. *See, e. g.,* 17 Am.Jur.2d, Contracts, § 509.

**9.** *See also* N.Y.C.P.L.R. § 3002(e), and Uniform Commercial Code, § 2–721, providing that claims for damages and rescission are not inconsistent.

**10.** *See also Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Eyman v. Mar-*

*sha Development Corp.,* 301 F.Supp. 931 (E.D. Mo.1969).

**11.** Perhaps if the facts showed that the Register did promptly and unequivocally notify Gannett, thereby demonstrably preserving its rescission remedy, then the waiver provision of the Agreement might come into play if Gannett tried to claim that some offhand remark short of a written waiver and not constituting an affirmance of the contract was a relinquishment of the remedy.

strictly speaking, "waived" his right but has executed it in favor of continued contractual relations.

*Apex Pool Equipment Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969).

■ For similar reasons the "laches" language used by the parties tends to obscure the real issue. When the Register argues that the doctrine of laches is inapplicable because the action is one at law rather than in equity, its attack on the use of a technical word may be abstractly correct; but when it implies that the remedy of rescission continues to be available as long as suit is filed within the statute of limitations, it is simply in error.[12] The right itself, and not just the remedy, is extinguished unless the injured party perfects the right by promptly taking the affirmative steps required by the law of contracts.[13] In the language of § 480 of the Restatement of Contracts, the power to avoid the transaction is *conditional* on an offer made promptly after acquiring knowledge of the fraud. Sections 483 and 484 provide that *the power of avoidance is lost* if the injured party unreasonably delays manifesting his intention to avoid to the other party, or if he manifests an intention to affirm, or if he exercises dominion over the object of the contract. The emphasized words are substantive and not procedural concepts.

■ Exercise of acts of ownership over the subject matter of the contract will validate the transaction and terminate the power of avoidance, regardless of whether the other party has suffered any prejudice. Restatement, Contracts, §§ 482, 484. The injured party must offer to restore the *status quo ante* by tendering what he has received in substantially as good condition as when it was transferred to him. Restatement, Contracts, §§ 349, 480. But the *status quo ante* requirement is not inflexible. Mere depreciation in market value will not prevent rescission, and other factors may make the equitable remedy of rescission available even though the property cannot be returned in the same condition. Restatement, Contracts, § 349, comment (b); 17 Am.Jur.2d, Contracts, § 514; *Lipsky v. Commonwealth United Corporation*, 551 F.2d 887 (2d Cir. 1976, applying New York law). If the wrongful acts of the defrauding party are what make restoration of the *status quo* impossible, rescission is not foreclosed. Restatement, Contracts, § 349(2)(b).

Of course, the factual issues in determining whether an injured party has exercised acts of ownership over the property and whether changes in the property render rescission inequitable are substantially more difficult where the property is a multi-million dollar business rather than a car or a cow or a country estate. The newspaper business poses particularly intractable problems since someone—whether plaintiff or defendant—must make daily decisions to keep the paper running in order to preserve subscription and advertising revenues which are highly sensitive to a variety of circumstances. The cases that have dealt with rescission of a contract for the sale of a business have evolved a rule that the injured party need not ignore the business and allow it to fail if the other party refuses to take it back upon a timely demand for rescission.[14] Rather, as long as the injured party's actions can be fairly viewed as necessary steps to preserve the value of the business for the one ultimately determined

---

12. In many cases one and two-month periods have been held to constitute excessive delay. *See, e. g., Sy-Jo Luncheonette, Inc. v. Marsav Distributors, Inc.*, 279 App.Div. 715, 108 N.Y. S.2d 349 (1st Dept. 1951).

While Comment a to § 490 of the Restatement of Contracts states that the power of avoidance continues "indefinitely" and may be set up as a defense if the injured party waits to be sued, it adds the important qualification "unless he affirms the transaction, *or fails to give information of his intention to exercise his power of avoidance* when the circumstances are such as to require information." [emphasis added].

13. *See Straley v. Universal Uranium & Milling Corp.*, 289 F.2d 370 (9th Cir. 1961).

14. However, he may close the business upon proper notification to the other party. *See Christakos v. Lockwood*, 90 U.S.App.D.C. 211, 194 F.2d 897 (1952).

to be the owner, rescission is still available.[15]

A few cases illustrate the foregoing principles, in the context of relatively clearcut factual situations. In *Caruso v. Moy*, 164 Neb. 68, 81 N.W.2d 826 (1957), the plaintiff bought a prosperous Chinese-American restaurant, changed the bill of fare to Italian-American, and tried to rescind the contract of sale on the ground of fraud when business fell off. The court found that he had continued to operate the business for too long a period of time after learning of the fraud before seeking rescission and that he had thereby made the business his own. He changed the restaurant substantially so that business fell off to less than half what it had been previously, possibly due in part to his own mismanagement.[16] On these facts, he was not entitled to rescission.

In *Sy-Jo Luncheonette, Inc. v. Marsav Distributors, Inc.*, 279 App.Div. 715, 108 N.Y.S.2d 349 (1st Dept. 1951), the plaintiffs discovered the alleged fraud within the first week after the purchase of the business. Yet they continued to operate the business for more than two months before sending a notice of election to rescind. Further, they inaugurated new pricing policies and changed the method of operating the business, causing a decline in gross receipts. Rescission was held to be unavailable. See also *Gargotto v. Sherman*, 297 Ky. 597, 180 S.W.2d 565 (1944); *Meyers v. Hoops*, 140 N.E.2d 65 (Ct.App. Ohio 1955); *Hampton v. Suter*, 330 S.W.2d 402 (Ct.App. Ky. 1959).

██ But other cases have granted rescission even though the injured party has continued to operate the business. Especially where the property may depreciate materially if abandoned, as where a large part of its value stems from the fact that it is a going concern, the injured party may take such steps as are reasonably necessary to conserve the value of the business for the one ultimately determined to be the owner.[17] The duty of care of a defrauded party who continues to operate a business for the benefit of the other party after sending a timely rescission notice and tendering the property back is that of a gratuitous bailee. *Widmer v. Leffelman*, 187 Or. 476, 212 P.2d 737 (1949), *later appeal*, 196 Or. 401, 249 P.2d 476 (1952).

### B. Securities Legislation Claims

The counterclaim as amended alleges violations of four statutory sections, § 10b of the Securities Exchange Act of 1934 (with the S.E.C.'s implementing Rule 10b–5);[18] §§ 12(2) and 17 of the Securities Act of 1933;[19] and Conn.Gen.Stat. § 36–338.[20] The legal standards to be applied in determining whether an injured party is entitled to rescission for violation of these antifraud provisions are essentially the same as the standards developed in common law fraud cases.

██ In Rule 10b–5 cases the law is well established that rescission must be demanded promptly after discovery of the fraud, or the right to rescission will be lost.

Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

---

**15.** *Mahurin v. Schmeck*, 95 Ariz. 333, 390 P.2d 576 (1964); *Widmer v. Leffelman*, 187 Or. 476, 212 P.2d 737 (1949), *later appeal*, 196 Or. 401, 249 P.2d 476 (1952); *Clark v. Wells*, 127 Minn. 353, 149 N.W. 547 (1914).

**16.** Even the best management will not preserve the rescission right, however, where the pattern of facts shows an intent to affirm the contract.

**17.** *Meyers v. Hoops*, 140 N.E.2d 65 (Ct.App. Ohio 1955); *Christakos v. Lockwood*, 90 U.S. App.D.C. 211, 194 F.2d 897 (1952); *Bevins v. Livesay*, 32 Tenn.App. 1, 221 S.W.2d 106

(1949); *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994 (1935); *Bergstrom v. Pickett*, 148 Minn. 224, 181 N.W. 343 (1921); *Eivers v. Peard*, 100 Or. 197, 197 P. 264 (1921); *Tarkington v. Purvis*, 128 Ind. 182, 25 N.E. 879 (1890); and cases cited in n.15 *supra*.

**18.** 15 U.S.C.A. § 78j; 17 C.F.R. § 240.10b5.

**19.** 15 U.S.C.A. § 77*l* and 77q.

**20.** Conn.Gen.Stat. § 36–346 creates civil liability for a violation of § 36–338.

This principle is stringently administered. Reasonable time is inceptive from the receipt by the rescinder of work putting him on notice. It is then incumbent upon him to pick up the scent and nose to the source. [citations omitted]. If the quest confirms the suspicion, then he must make decision with reasonable dispatch. Failing this, entitlement to rescission disappears.

*Baumel v. Rosen*, 412 F.2d 571, 574 (4th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970).

The logic of this rule is particularly compelling when the property in dispute consists of stocks or fungibles of fluctuating value. A party could otherwise sit back without notification to the wrongdoer and, within the allowable period to sue, watch the market go up or down, thereby speculating on the success or value at the total risk of the wrongdoer. . . . Although the law does not favor a wrongdoer, neither does it promote speculative damages at his expense.

*Myzel v. Fields*, 386 F.2d 718, 740–41 n.15 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). "The securities laws contemplate no such investment guarantee." *Hickman v. Groesbeck*, 389 F.Supp. 769, 780 (D.Utah 1974). Prejudice inevitably flows from delay where there is a precipitous decline in the value of the stock the defrauded buyer now seeks to return. "Further rationale for the requirement of immediacy is that every day's lapse renders more difficult the very aim of re-

scission: to return the parties to statu quo ante." *Baumel v. Rosen, supra* at 575. The cases upholding these principles in Rule 10b–5 actions are legion,[21] and the same rules have consistently been applied in actions under §§ 12 and 17 of the 1933 Act as well.[22]

■ Whether the Connecticut Act requires comparable promptness is a more troublesome question, since no Connecticut cases or cases interpreting the corresponding provision of the Uniform Securities Act in any other jurisdiction[23] have dealt with the point. The Connecticut Act contains the following provision not found in either of the federal acts:[24]

§ 36–346(e). No person may sue under this section more than two years after the contract of sale. No person may sue under this section (1) if the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid, together with interest at six per cent per annum from the date of payment, less the amount of any income received on the security, and he failed to accept the offer within thirty days of its receipt, or (2) if the buyer received such an offer before suit and at a time when he did not own the security, unless he rejected the offer in writing within thirty days of its receipt.

The Register claims that this section abrogates the common law rule requiring promptness in notifying of intention to re-

---

**21.** *See, e.g., Johns Hopkins Univ. v. Hutton*, 488 F.2d 912, 916 n.12 (4th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210 (9th Cir. 1962); *Wassel v. Eglowsky*, 399 F.Supp. 1330 (D.Md. 1975); *Fox v. Kane-Miller Corp.*, 398 F.Supp. 609 (D.Md. 1975); *Goodman v. Poland*, 395 F.Supp. 660 (D.Md. 1975); *Ehrler v. Kellwood Co.*, 391 F.Supp. 927 (E.D.Mo. 1975), *aff'd*, 521 F.2d 1347 (8th Cir. 1975); *Chelsea Associates v. Rapanos*, 376 F.Supp. 929 (E.D.Mich. 1974), *aff'd*, 527 F.2d 1266 (6th Cir. 1975); *Marth v. Industrial Incomes Incorporated of North America*, 290 F.Supp. 755 (S.D.N.Y. 1968).

**22.** *Occidental Life Ins. Co. v. Pat Ryan & Associates, Inc., infra* (§ 12 of 1933 Act); *Straley v.*

*Universal Uranium & Milling Corp.*, 289 F.2d 370 (9th Cir. 1961) (§ 12 of 1933 Act); *Johns Hopkins Univ. v. Hutton, supra* (§ 17 of 1933 Act).

**23.** The provision is identical to § 410(e) of the Uniform Securities Act.

**24.** For violations of § 10(b) of the 1934 Act or § 17 of the 1933 Act there is no federal statute of limitations, so the appropriate statute of limitations of the forum state applies. *Hitchcock v. deBruyne*, 377 F.Supp. 1403 (D.Conn. 1974). Section 13 of the 1933 Act, 15 U.S.C.A. § 77m, provides the statute of limitations for a violation of § 12(2).

scind. It argues that this section gives a defrauding seller all the protection it needs against the risk that a buyer will speculate before deciding to rescind. According to the Register, all Gannett needed to do to cut short the period of its exposure to a rescission claim was to make its own offer of rescission in the manner prescribed by the statute. Having failed to do so, it cannot later complain that the Register brought suit some eight months after the transaction but well within the two-year limitation period.

This is a conceivable reading of the statutory language, but not a persuasive one. On its face the provision only sets up a two-year statute of limitations and provides a way for the seller to cut short the limitations period by offering to return the consideration paid to the buyer.[25] The rule requiring promptness in demanding rescission has consistently been applied apart from the statute of limitations,[26] and serves significantly different purposes. A statute of limitations, as a statute of repose, enables a potential defendant to close the books on transactions in the past after a certain length of time has passed. It bars all claims for any form of relief. It also protects to some degree against failing memories and loss of evidence due to lapse of time. But the promptness rule limits only the time in which the remedy of rescission is available. Although it obviously overlaps in function with the statute of limitations, it serves the particular purpose of promoting early resolution of whether the seller or the buyer will be required to take responsibility for a property the sale of which was induced by fraud at a time when it is reasonably likely that the property returned resembles the property sold. Promptness is required not only for the reasons promoted by a statute of limitations, but also because of the strong policy against forcing return of the property on the seller when lapse of time—or actions taken by the buyer during that time—have changed the property. Even when the magnitude of the fraud is grave, as is alleged in this case, the law has never allowed the defrauded party to experiment with the property or speculate on its value for as long as he likes within the statute of limitations and then force the wrongdoer to take back a changed item.

Placing the burden on the seller to make the rescission offer, as the Register suggests is proper under this statute, would be a drastic change in the law and could often result in considerable unfairness. In many cases the seller may believe that no securities violation occurred, even though the buyer and ultimately a court disagree with him. Until the buyer notifies him of the buyer's belief that the transaction is tainted and the buyer's desire to return the property, a seller has no reason to think he needs to make a rescission offer. The Register's construction of the statute would require a seller to keep track of securities he has sold for two years after the sale, staying vigilantly on the lookout for potential declines in value that might signal a need to make a rescission offer to protect himself. This approach would inject a high degree of needless uncertainty into securities transactions, for no apparent reason other than giving buyers time to speculate. No court appears to have ever given the Register's construction to this provision. If the legislature intended to abrogate the otherwise universally applied promptness rule, it could surely have found a less oblique way of doing so.

The Register next argues that the anti-waiver provisions of the securities laws entitle it to rescission as a matter of law. These provisions, which are essentially the same in the 1933 and 1934 Acts and in the Connecticut Act,[27] declare that any condi-

---

**25.** Without such a provision a seller probably would not be able to extinguish a contingent liability until the end of the limitation period. 3 Loss, Securities Regulation 1641–43 (2d Ed. 1961).

**26.** *See* n.11 *supra* and accompanying text.

**27.** Section 14 of the 1933 Act, 15 U.S.C.A. § 77n; § 29(a) of the 1934 Act, 15 U.S.C.A. § 78cc(a); and Conn.Gen.Stat. § 36–346(g). The Connecticut provision corresponds to § 410(g) of the Uniform Securities Act.

tion, stipulation, or provision binding any person acquiring a security to waive compliance with the securities legislation is void. Like the anti-waiver provision of the Purchase Agreement, these statutory sections do not abrogate the rule of law that an injured party must take prompt action to notify the other party of his intention to rescind in order to preserve his rescission right. Nor do they relieve him of his obligation to refrain from treating the property as his own if he expects the other party to take it back. Several federal cases have held that the anti-waiver provisions of the federal laws apply only to purported *prior* waivers made in connection with the contract of sale and not to conduct after the termination of the transaction.[28] They have held that subsequent conduct evidencing affirmance of the conduct after full knowledge of the fraud extinguishes the substantive right to disaffirm notwithstanding the anti-waiver provisions of the statute. *Eyman v. Marsha Development Corp.*, 301 F.Supp. 931 (E.D.Mo.1969); *Junker v. Midterra Associates, Inc.*, 49 F.R.D. 310 (S.D.N.Y.1970), and cases cited therein. There are apparently no Connecticut cases construing the comparable state law provision, but it is reasonable to assume that the Connecticut courts would interpret it in accordance with the rule evolved by the federal courts in construing identical language.

■ . The Register further argues that because Gannett violated federal and state securities legislation by perpetrating the frauds, the contract is illegal and thus void as a matter of law without the necessity of notification by the Register of intent to avoid. The argument has two aspects. First, there is a statutory argument based on § 29(b) of the 1934 Act, 15 U.S.C.A. § 78cc(b). That section, which has no counterpart in the 1933 Act or the Connecticut Securities Act,[29] reads in part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract
> . . . . .

The Register asserts that by virtue of this statutory provision its contract with Gannett is wholly void. The second aspect of the argument is that under general principles of contract law, apart from the effect of § 29(b), the agreement is void for illegality because Gannett violated state and federal laws.

■ Neither aspect of the illegality argument finds support in the case law. Section 29(b) has been consistently construed to make contracts in violation of the 1934 Act voidable, not void:

> Though § 29(b) speaks in terms of "void" and the guilty party is clearly precluded from enforcing the contract against an unwilling innocent party, just as clearly the innocent party is left free to enforce the contract if he so desires. This being true the contract cannot possibly be considered absolutely and totally void. It is a contract "voidable" at the option of the innocent party. If this contract is "void-

---

28. *Cf. Murtagh v. University Computing Co.*, 490 F.2d 810 (5th Cir. 1974). In *Murtagh* the Court held that a settlement agreement entered into after a violation has been discovered can waive remedies under the securities laws, but that a Court should scrutinize any such agreements carefully to guard against unintentional or involuntary waivers. The action in *Murtagh* was for damages, so the question of "waiving" a right to rescission was not presented.

29. Conn.Gen.Stat. § 36–346(f) provides:

> No person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any regulation hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

This provision is identical to § 410(f) of the Uniform Securities Act.

able," or void only at the option of the innocent party, *the contract must be considered valid until voided by the party having the right of rescission.* [emphasis added].

*Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 792 (8th Cir. 1967); *Occidental Life Ins. Co. v. Pat Ryan & Associates, Inc.*, 496 F.2d 1255 (4th Cir. 1974), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Reserve Life Ins. Co. v. Provident Life Ins. Co.*, 499 F.2d 715 (8th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 803 (1975); see also *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting). These cases hold that § 29(b) codified the common law principles of illegal bargains. Under these principles, an agreement induced by fraud in violation of the securities acts is not *ipso facto* void, neither under § 29(b) nor by virtue of the "illegalities" in the formation of the contract.[30] Since such a contract may be either affirmed or avoided by the innocent party, that party faces the same choice under the securities acts when he learns of the fraud as he faces under the common law. If he wishes to avoid the contract, the steps he must take to preserve his rescission remedy are the same as at common law. Similarly, conduct that affirms a fraudulently induced contract under general contract law principles, such as acceptance of benefits under the contract or exercise of acts of ownership over the property, will terminate the injured party's power to avoid the contract on illegality grounds, where the only illegality is viola-

tion of the antifraud provisions of the securities laws.

There is no reason to think the result should be any different under Conn.Gen. Stat. § 36–346.[31] While apparently some states construe their blue sky laws to make contracts void rather than voidable, at least where registration requirements are violated, see 69 Am.Jur.2d *Securities Regulation—State* § 97, Connecticut does not have any statutory language hinting that this was what the legislature intended for fraud violations. The most the Connecticut statute does is preclude the violator from basing a suit on the contract. See 3 Loss, Securities Regulation 1669–71 (1961). Without a considerably more explicit statutory directive, it would not be appropriate to declare a contract of this type wholly ineffective, with a consequent availability of rescission without regard to promptness of demand.

Finally, the Register argues that regardless of the changes that have taken place in the *Times* since the time of original transaction, rescission is available because return of the stock certificates restores the *status quo* to the full extent to which Gannett is entitled. For this curious proposition the Register cites one securities law case, *Occidental Life Ins. Co. v. Pat Ryan & Associates, supra*, and a hundred-year-old Supreme Court case, *Neblett v. MacFarland*, 92 U.S. 101, 104, 23 L.Ed. 471 (1875), for the proposition that "[i]t is no objection to a restoration of property received on a fraudulent sale that it has fallen in value since the date of the transaction."[32]

---

**30.** This is not a contract for murder for hire or to engage in an illegal wager. The only public policy involved is the policy against fraudulent representations in a business transaction.

**31.** *See* n. 29 *supra.*

**32.** If the *only* objection to rescission were a decline in value, the citation of *Neblett* would have persuasive force. However, undue delay, exercise of ownership, and conduct affirming the contract can preclude rescission regardless of the *status quo* problem.

If a "precipitous decline in the value of the stock" occurs during the period of unreasonable delay rather than before or after, the purpose of the promptness rule is obvious. *Gordon v. Burr*, 366 F.Supp. 156 (S.D.N.Y.1973), *aff'd in part, rev'd in part, and remanded*, 506 F.2d 1080 (2d Cir. 1974). The *Neblett* rule makes sense only where the decline took place before knowledge of the fraud or after notification to the opposing party.

The *Occidental Life* case provides no support for the Register's claim that the possibility of return of the stock certificates preserves the entitlement to rescission.[33] The argument made in that case was that although the transaction involved "securities" in the literal sense, the securities were merely a mechanism for effecting the sale of the assets of a business. The theory was that the stock was not an investment and that its sale was beyond the coverage of the 1934 Act. The Court properly rejected this argument and held the 1934 Act applicable. Gannett has never questioned the applicability of the 1934 Act. Moreover, *Occidental Life* itself held that rescission was unavailable under both the 1933 and 1934 Acts because of undue delay. The case in no way stands for the proposition that rescission continues to be available as long as the stock certificates can be returned.

In light of the foregoing legal standards, the pertinent factual inquiries are the following:

1. When did the Register discover the fraud?

2. Did the Register promptly notify Gannett of its intention to rescind and offer to return the property?

3. Did the Register affirm the contract after knowledge of the fraud by exercising acts of ownership over the *Times*? Or did its conduct in continuing to operate the *Times* constitute a justifiable attempt by a gratuitous bailee to conserve the property for the benefit of the ultimate owner?

4. If the Register has otherwise preserved its rights, is rescission nonetheless inequitable due to changed conditions and inability to restore the *status quo ante*?

## III. FACTS

### A. *Discovery of the Fraud*

The Register was on notice of the possibility of fraud on October 11, 1973, the day after the closing. On that day Raymond Dumont, the Controller of the *Times*, talked with Richard Harris, Vice President and Director of the Register and new Assistant Publisher of the *Times*, and told him that there were discrepancies in the circulation statistics of the *Times*. In meetings over the next few days Dumont disclosed the possible overvaluation of certain assets on the balance sheets of the *Times* as appended to the Purchase Agreement, and described a series of devices used for several years at the *Times* to conceal the reporting of inflated circulation figures to both Gannett and the Audit Bureau of Circulations, a nationally recognized organization that collects and publishes the circulation statistics of member newspapers.

A number of cases have held that the reasonable time period within which rescission must be demanded starts the moment the injured party is on notice of the fraud. *Baumel v. Rosen, supra; Johns Hopkins Univ. v. Hutton, supra.* Whether notice means actual knowledge or only facts reasonably prompting further inquiry need not be resolved here, since in this case actual knowledge followed closely on the heels of the date the Register was put on notice of the possibility of fraud. Ernst & Ernst, the accounting firm retained by the Register to determine the accuracy of the September 30, 1973, balance sheet attached to the Purchase Agreement, was in the process of conducting its audit during the months of October and November and furnished a tentative report of its audit on November 21, 1973, and a "Supplemented Tentative Report" on December 6, 1973. The Audit Bureau of Circulations began its audit of the circulation statistics on November 7, 1973, and made a preliminary report to the *Times* prior to December 12, 1973. During the period of these audits the Register was gathering information from *Times* personnel about the nature and extent of the frauds. Exhibits introduced by Gannett document that during the months of October and November most of the frauds came to light.

Further, the Register took a number of actions in the months of October and November indicating its awareness of the

---

**33.** The passage the Register cites is found at 496 F.2d 1262–63.

frauds and its apprehension that the frauds were of sufficient materiality to have breached the contract. On the advice of Curtiss Thompson, counsel to the Register, the payments due to Gannett under the net current asset adjustment provision of the Purchase Agreement were withheld. This action was confirmed by a resolution of the Register's Board of Directors on October 25, 1973. At the Board meeting on that date the Board heard reports on the discrepancies and authorized a committee to "seek to obtain a fair and reasonable settlement and resolution of all such issues with Gannett." As of that date, John Fassett, who was a lawyer on the Register's board of directors, and possibly Thompson as well, were of the opinion that the Register had the option of rescinding the contract. If there is any doubt as to when Thompson agreed that facts existed making rescission an option, the latest possible date was November 30, 1973, when he wrote a letter to Gannett's Vice-President containing the following:

> In this letter I intend to acquaint you with the view of some of us at the Register on the revelations that followed the closing; but you will appreciate that it lies within the authority of our directors to make ultimate decisions. Their next meeting is December 18th and as I see it they must decide first whether the agreement should be rescinded or some other solution found. It is imperative that this decision be made promptly.

> \* \* \* \* \* \*

> It is clear that certain representations and warranties of Gannett were incorrect and false and that it failed to perform certain of the covenants, conditions and agreements contained in the Purchase Agreement. . . . [The frauds as discovered are then described in some detail.]
> Nothing in this letter should be construed as an election of remedies.

Whatever hedging Thompson attempted in this letter relates to remedy only and not to awareness of the fraud. He recognized the existence of several options open to the Register and the ultimate authority of the Register's Board to choose among them, but he leaves no ambiguity concerning his (and the Register's) knowledge of the fraud and opinion of its seriousness. I find, therefore, that full knowledge of the fraud may well have occurred at some point between October 11, 1973, and November 30, 1973, but that the very latest date for charging the Register with the responsibility of notifying Gannett within a reasonable time of its intention to rescind was November 30, 1973. Any revelations made after that date, including the confirmations coming from more definitive versions of the audit reports, were merely cumulative to the reasonably credible and certain information the Register had obtained prior to that date, which enabled Thompson to phrase his letter in terms that were very definite as to awareness of fraud and were uncertain only as to the remedy the Register would decide to pursue.

■ The Register's claim that aspects of the fraud continued to be discovered even into 1976 (thereby continuing at least until the date of these subsequent disclosures the availability of rescission) essentially involves subsequent knowledge by the Register that officials of Gannett knew about the misrepresentations. At most this allegation would establish that the element of scienter, necessary for the securities laws and common law fraud counts, is more easily provable than if the requisite knowledge were shown to be possessed only by officials of Gannett's subsidiary, The Hartford Times, Inc. Even if it could be said that the Register's cause of action for fraud was not provable until a later date, the earlier availability of the cause of action for breach of warranty (provable without regard to what the Register alleges was subsequently acquired knowledge of Gannett's knowledge) was sufficient to create in the Register a right to demand rescission. It is the failure to assert that right within a reasonable time after awareness of its availability that results in affirmation of the contract and consequent loss of the right to rescind thereafter. The right is not revived by subsequent knowledge of a cause of action

requiring more extensive proof than that required for a cause of action known to the buyer at an earlier time. If there could conceivably be a case where facts were subsequently learned that gave a buyer a cause of action *easier* to prove than a cause of action he knew was available previously, a right of rescission might still be available, but that is plainly not the situation here.

## B. *Notification of Intention to Rescind*

The Register filed its counterclaim with a prayer for rescission on June 12, 1974. That date is therefore the latest date that the necessary rescission notice or demand took place. Whether any of the Register's earlier actions constituted notice of intent to rescind or otherwise preserved the right to rescind is the principal factual dispute between the parties. The difficulty in resolving this dispute stems in large part from the fact that during virtually the entire period between November 30, 1973, and June 12, 1974, the parties were engaged in serious settlement discussions.

Whether even to consider what occurred at the settlement meetings is a threshold matter that the Register has pressed with some vigor. In a prior evidentiary ruling in this case I held that evidence of what representatives of Gannett said at these meetings was not barred by the privilege protecting settlement negotiations when offered by Gannett. But that evidentiary ruling, dealing as it did only with the issue of privilege, did not dispose of all the legal claims made by the Register relating to the propriety of considering the proffered evidence.[34]

One such claim—perhaps the most sweeping—is that the pendency of the settlement negotiations tolled the running of the promptness clock and that the Register was under no obligation to notify Gannett of

intent to rescind until the negotiations had irrevocably fallen through. This approach, which would tend to further the general policy of the law to encourage settlement of disputes short of litigation, finds some support in the case law of rescission. As one court has stated of delay in seeking rescission,

> Time alone is of slight significance, and, when it appears, as it does here, that the delay was occasioned by efforts to reach an amicable adjustment with offers and counter offers, the time so taken and the efforts so made cannot be counted as a time of sleeping on rights or an intention to forego remedy.

*Plate v. Detroit Fidelity & Surety Co.*, 229 Mich. 482, 201 N.W. 457, 458 (1924). See also *LaForce v. Caspian Realty Co.*, 242 Mich. 646, 219 N.W. 668 (1928); *O'Donnell & Duer Bavarian Brewing Co. v. Farrar*, 163 Ill. 471, 45 N.E. 283 (1896). The appeal of this approach is that it favors the innocent party who has been trying in good faith to resolve the controversy amicably and puts the risk of uncertainty on the perpetrator of the fraud.

For several reasons, however, I am unwilling to accept an approach that would totally preclude any inquiry into what happened during the period of settlement negotiations. If the settlement period continues for any significant length of time, the buyer has the opportunity to indulge in just the sort of speculation the promptness rule was designed to prevent. Two sorts of essentially speculative delay could unreasonably prolong the period of settlement negotiations: delay for the purpose of speculation on the value of the property involved, and delay for the purpose of negotiating a favorable monetary settlement of the dispute. The latter is, in essence, speculation on the value of a potential lawsuit. While the

---

34. None of the terms or figures of any offers of settlement was accepted into evidence. Under the Court's prior evidentiary ruling, Gannett was permitted to offer evidence of statements its representatives made during the course of settlement negotiations for whatever independent probative value they might have in demonstrating the Register's awareness that Gan-

nett was willing to take the *Times* back. The Register preserved its objection for appeal purposes (*see* transcript, June 24, 1976, pp. 48–49), but decided in light of the Court's ruling permitting the Gannett version to come in that it would have to offer Lionel Jackson's testimony to put the matter in context.

amount of damages that might be acceptable in a settlement is not the item courts usually have in mind when they deny a rescinding buyer the right to "speculate," this amount bears a close relationship to the current value of the property being sold. The relationship is nonetheless close for being inverse: the buyer who sees the value of the property he bought declining will normally increase his damage demand so that an acceptable damage figure is inevitably a function of the subsequent value of the property. To let a rescinding buyer extend the time period in which he must demand rescission until the possibility of a monetary settlement has been pursued to an unsuccessful conclusion would have the undesirable feature of permitting the buyer to keep one eye on the fluctuating value of the property while he adjusts his negotiating demands. A complete tolling of the running of the reasonable time period during settlement negotiations could thus allow a buyer to prolong his opportunity for speculation, at least until the seller decided to call a halt by breaking off the discussions or by making his own unequivocal rescission offer, refusal of which would waive the buyer's rescission option or estop him from later asserting it. Furthermore, a party that wants rescission, even though the victim of a fraud, is not being disadvantaged at all by being required to make up his mind within a reasonable period after knowledge of the fraud and to give notice that he wants to return the property. At least with respect to functioning businesses, such an obligation promotes needed certainty in the marketplace. Moreover, it is a principle easily understood by parties seeking rescission and easily followed.[35] Further, any inquiry into whether the period was prolonged for *bona fide* settlement purposes rather than with a speculative motive would require some examination of the reasonableness of the terms and figures demanded by the rescinder, in direct conflict with the settlement privilege and the policies behind it.

Counting the settlement period either entirely "in" or entirely "out" in determining the reasonable promptness of a rescission demand would each have undesirable risk allocation consequences. The first puts all the risk on the innocent buyer and deters the amicable resolution of disputes. The second places the entire risk of speculation on the seller, who may not even know until the unsuccessful end of damage negotiations that rescission has been in the buyer's mind all along.

The better approach, appropriate to a remedy as drastic as rescission, takes into account all the facts and circumstances that bear on reasonableness, with due regard for the sensitive nature of settlement negotiations and the policy reasons for protecting them. Though discussions may continue over months or even years, the acts and omissions of the parties must retain their normal legal significance. Exercise of acts of ownership over the property, evidencing an intent to affirm the contract, see Section C *infra*, will extinguish the right to disaffirm regardless of the pendency of negotiations, as will disposal of the property with knowledge of the fraud or any other act or omission that is clearly inconsistent with a later claim for rescission. Time no more stands still during settlement negotiations culminating with a rescission demand than it does when the statute of limitations runs during settlement. The fact that the parties agree, as they apparently did at the commencement of negotiations in this case, that settlement talks will be "without prejudice" and understand that participation in the negotiations will not *of itself* lessen their substantive rights does not always relieve the would-be rescinder of his duty to take the steps the law requires to preserve his rescission remedy. Legally significant acts and omissions can operate of their own force to terminate

---

**35.** If the Register did not understand in the circumstances of this case that failure to make a reasonably prompt demand for rescission would defeat a later claim for rescission in Court, any unfairness is substantially mitigated by the fact that its claim for rescission is defeated in any event by the clear evidence of its acts of ownership. *See* Part C, *infra.*

the right to rescission. The pendency of settlement discussions is simply one circumstance, albeit an important one, in determining the reasonableness of what the rescinding party did or failed to do.

 There may well be situations in which the absence of a rescission demand would be reasonable under all the circumstances, as where the value and condition of the property remained constant during the negotiations so that no element of prejudice to the seller came into play, or where the seller's assurances of a favorable monetary settlement dissuaded the buyer from making an early demand. Or a slight delay in making a rescission demand, which would not preserve the remedy in the absence of settlement efforts, might well be reasonably timely if made unequivocally early in such discussions. Similarly if a buyer, once alerted to his right to rescind, promptly demands rescission, he should not lose the remedy because he negotiates with the seller, even for an extended time, to see if the rescission can be handled amicably without resort to litigation. That was the situation in *Gordon v. Burr*, 366 F.Supp. 156, 171 (S.D.N.Y.1973), *aff'd in part, rev'd in part, and remanded without consideration of this point*, 506 F.2d 1080 (2d Cir. 1974). I do not hold that the passage of time precludes rescission regardless of the circumstances. Rather I find that under the circumstances of this particular case rescission is unavailable. The absence of a rescission demand takes on special significance in this case, where the evidence is persuasive that even apart from the Register's omissions, its acts evidenced an intent to affirm the contract.

At no time during the relevant period did the Register's Board of Directors resolve to present a rescission offer to Gannett, although the subject of rescission was discussed at several board meetings. At the meeting on October 25, 1973, the possibility of rescission was discussed, but the operating officers of the *Times* reaffirmed their view that the purchase was desirable. The only action taken by the Board was to vote

That Management and Mr. Thompson cause the auditors to proceed with all deliberate speed with the full financial audit of The Hartford Times and similarly proceed with all other analyses they deem appropriate to determine all breaches by Gannett of its obligations pursuant to the contract; that they seek to obtain a fair and reasonable settlement and resolution of all such issues with Gannett; and that, until approval by the Board of such a resolution of all such issues, the balance due to Gannett pursuant to the contract not be paid.

At the meeting of December 18, 1973, the Thompson letter of November 30 was discussed, and a rather optimistic report prepared by Richard Harris, Vice-President and Assistant Publisher of the *Times*, was distributed. This meeting was reconvened on December 27, 1973. Again no action to rescind was taken. It was voted:

That the directors delegate to a special committee composed of the President and Messrs. Thompson, Stearns and Richard G. Harris full authority to negotiate with Gannett for a settlement of all outstanding claims of the corporation against Gannett and to enter into such agreement of settlement of such claims as the members of such committee in their sole discretion deem reasonable and prudent and in the best interests of the corporation.

On May 2, 1974, the Board reconvened its April 30 meeting and continued its discussion of an offer of settlement from Gannett. They authorized the submission of a proposed counter-offer, but the minutes contain no mention of any rescission proposal. It was not until February 25, 1975, that the Board of Directors specifically approved a rescission proposal to be submitted to Gannett.

The absence of any earlier specific Board authorization of rescission is not necessarily determinative since the negotiating committee had full authority to make proposals to Gannett. The Register thus argues that the position taken by the negotiating committee during the discussion period fully preserved its right to rescission. The testimony presented by both sides and not ob-

jected to by the Register is consistent with regard to that negotiating position. Several witnesses from both sides testified that Curtiss Thompson, counsel for the Register, insisted that the negotiations "must result in the Register being compensated or [Thompson] would demand rescission of the deal." (Neuharth Testimony, July 24, 1975, p. 266). Lionel Jackson, Publisher of the Register, testified that the committee "offered rescission as an alternative to if there was not a fair settlement at practically every meeting that we had with Gannett." (Jackson Testimony, June 24, 1976, p. 96). Jackson also described the Register's position with regard to rescission throughout the negotiations in the following terms:

It has been that we were seeking a fair settlement for the fraud and the misrepresentations that were involved in the sale to induce us to purchase the stock of The Hartford Times, and that we were looking for a fair settlement for the damages involved, and that if we could not get a fair settlement, that rescission was the only alternative left for us to seek.

(Jackson Testimony, June 24, 1976, p. 68). Neuharth referred to the rescission alternative as an "ultimatum." (Neuharth Testimony, July 24, 1975, p. 269).

I agree with Gannett that none of these references to rescission made by Register spokesmen constituted the notification of intent to rescind required by law to preserve the rescission remedy. It may well be that the Register preferred rescission to an insubstantial monetary settlement. But the testimony makes clear that the Register decisively preferred what it called a "fair" monetary settlement to rescission. As long as the Register was compensated for the frauds, it wanted to keep the *Times* to run as its own paper.

Several aspects of the testimony show convincingly that the Register wished to affirm the purchase contract and keep the *Times* rather than rescind. The first is Lionel Jackson's testimony in Court. The statements of Jackson, as Publisher and Chief Executive Officer of the Register and member of the negotiating committee appointed by the Board of Directors, are probably the most probative evidence of the corporate opinion of the Register during the time period in question. In response to questioning by the Court, Jackson testified:

I can say, your Honor, that the rest of the board—I can't speak for, I can only say for myself—that it was very, very distasteful for me to have to think about rescission because, after all, we didn't get into all this thing. We hoped to have a very successful joint newspaper situation in Hartford and New Haven, and we bought it with a purpose in mind, and it was—it certainly didn't help our reputation to have The Hartford Times turn out to be what it was, and rescission would have made it even worse.

(Jackson Testimony, June 24, 1976, p. 108).

Further, the Register had been engaged in defending the purchase of the *Times* in a lawsuit in the state court. The majority of the outstanding shares of the Register Publishing Company are owned by the John Day Jackson trust. When Jackson and Henry J. Conland, two of the three trustees of that trust, announced their intention to cause the Register to acquire the *Times* from Gannett, several beneficiaries of the trust instituted an action in the Superior Court in New Haven County in May of 1973 to enjoin the purchase. After injunctive relief was denied and the purchase consummated, the plaintiffs filed a substituted complaint alleging breach of fiduciary duty and seeking, *inter alia*, rescission of the sale.[36] During the entire period in question the Register was defending the purchase of the *Times* in state court as a prudent investment. A decision to rescind the contract might well have been an admission that the beneficiaries were right. In a highly significant letter dated June 5, 1974, and sent by Lionel Jackson and Henry Con-

---

**36.** Some two years after the filing of the original state court action the Register filed a cross-claim against Gannett, alleging breach of warranty and fraud and seeking to have the trans-action rescinded. This cross-claim was ultimately expunged. *Jackson v. Conland*, 171 Conn. 161, 368 A.2d 3 (1976).

838

land to Rose Sheppard, Jackson's sister and a plaintiff in the state court action, Jackson and Conland stated:

> We don't know where you got the impression that The Register Publishing Company is seeking rescission, but it is obviously the result of misconstrued information which has caused the destruction of the family relationship.

This passage drastically undercuts the Register's claim that it was actively seeking to preserve the rescission remedy.[37]

Still another incident leads to the conclusion that what the Register really wanted was a monetary adjustment that would enable it to keep the *Times*. The parties offer differing versions of the incident, but even viewing the reports in the light most favorable to the Register does not warrant drawing the inference that the Register properly preserved its rescission remedy. This incident took place at either the December 6 or the January 23 settlement meeting (the parties disagree on the date). Neuharth's version includes the following:

> Well, earlier in the meeting, Mr. Thompson had frequently referred to rescission as being the alternative that The Register Company would demand if its money settlement demand was not met. The reason that I directed the conversation to Mr. Jackson at that point was that I felt that I should determine whether the principal wanted rescission. . . .
>
> I turned to him, he was sitting to the right of me, and I said—I said, first, that we simply could not consider what I felt were the unrealistic money demands of Mr. Thompson, and, therefore, if the only alternative to that was rescission, "Lionel, let's reverse the deal and go on about our business and be friends." And I believe those were my exact words.

Neuharth Testimony, July 24, 1975, pp. 291–292 (see also p. 256). Neuharth stated that the reason why he needed to know whether the Register really wanted Gannett to take the *Times* back was that at

that time the *Times* was still substantially the same property Gannett had sold to the Register, and that any wait in clarifying the Register's intentions might make rescission more difficult. (Neuharth Testimony, July 24, 1975, p. 296). John Purcell of Gannett confirmed Neuharth's recollection of the conversation. (Purcell Testimony, July 24, 1975, p. 305).

Lionel Jackson recalled the conversation in this way:

> [A]fter Mr. Neuharth heard what [Thompson's] terms were, he turned to me and he said, "I don't think your lawyers are speaking for the principals." I said to him, "Well, I'm sure that Mr. Thompson is speaking for me."
>
> And he said, "Well, you don't want me to take the paper back, do you?"
>
> * * * * * *
>
> It was a flippant offer, it was no offer of rescission, believe me. He just turned to me and said, "You don't want me to take it back, do you?"

Jackson Testimony, June 24, 1976, pp. 102, 106.

Some of the confusion about the meeting is probably due to Gannett's characterization of Neuharth's proposal (or question) as a "rescission offer." Much of the cross-examination and argument from each side aimed at showing that Neuharth had not been authorized by his board to make a rescission offer or that Jackson never presented the offer to his board is beside the point. Neuharth did not make the kind of unequivocal offer that would have terminated Gannett's rescission liability as a matter of law under Conn.Gen.Stat. § 36–346(e) or the other securities statutes. *Cf. Meyers v. C & M Petroleum Producers, Inc.*, 476 F.2d 427 (5th Cir. 1973). The liability for rescission was there just after the conversation as well as before. But the incident is highly significant in at least two regards. First, it fortifies the persuasive evidence that Jackson and the Register strongly

---

**37.** A Memorandum of Facts concerning this letter filed by the Register indicates that up until the day of the filing of the counterclaim in this action on June 12, 1974, the Register was still attempting to reach a monetary settlement with Gannett.

wanted to run the *Times* and decisively preferred keeping the *Times* with a monetary settlement to giving it back. There is no indication that the Register demanded rescission as its preferred remedy or even asserted it as an equally acceptable remedy to money demands. Second, the incident demonstrates that the Register was on notice of the particular importance in this case of promptness in making a rescission demand. I fully credit Neuharth's testimony that he needed to know *then* whether rescission was really in the picture, because conditions at the *Times* were quickly changing. The point is not that the Register waived rescission by not immediately accepting Neuharth's suggestion. What the suggestion made clear was the need for the Register, if it really wanted rescission, to assert its demand within a reasonable period of time, even though discussions of a monetary settlement were in progress.

On the basis of all the evidence I find that no notification of intent to rescind was given to Gannett within a reasonable time after the Register had discovered the frauds.

## C. *Exercise of Acts of Ownership*

▉ Wholly apart from the reasonableness of the delay in demanding rescission, the Register's conduct clearly evidences an intent to affirm the contract for the purchase of the *Times*. The evidence is persuasive that during the period after discovery of the frauds the Register exercised dominion over the *Times* by treating it as its own property and did not operate it as a gratuitous bailee for the benefit of the ultimate owner. Gannett cites a long catalogue of business decisions made by the Register in its operation of the *Times* during the period before June 12, 1974, and after. The Register, on the other hand, has enumerated many steps the Register abstained from taking, allegedly because of the possibility that it might have to give the *Times* back to Gannett. Some of the actions Gannett has listed could well have been ones that even a gratuitous bailee would want to take, while some of the omissions the Register has identified might

not have materialized in any event. Not all these management decisions need be reviewed. But two major categories of decisions significantly indicate the Register's intent to treat the paper as its own and thus to affirm the contract and forego rescission. The first category includes *major business decisions* taken without notification to Gannett, and the second consists of steps to integrate the operation of the *Hartford Times* with the operation of the two New Haven papers published by the Register.

If the Register had truly intended to hold the *Times* for Gannett's benefit in the event rescission was ultimately effected, one would have expected at least some sort of notice to Gannett of major changes to be made in the management of the *Times* to allow Gannett an opportunity to agree to voluntary rescission before irrevocable steps were taken. Probably the most important action taken was the decision to go to cold type from hot metal, a step that apparently most newspapers around the country are gradually taking, but one that requires substantial capital outlays. The testimony showed that the conversion to cold type was estimated to require an investment in the neighborhood of $500,000 to result in substantial savings over the long run after an initial period of increased expense during the transition period. I am willing to agree with the Register that the decision to go to cold type was a prudent one that would result in long-range savings. But this kind of major investment without consultation with or even notification to Gannett is inconsistent with the theory that the Register considered itself the bailee rather than the owner of the *Times*. The testimony of Lionel Jackson shows that Gannett was never notified, and that in fact the Register's Board may even have discussed whether to notify Gannett and arrived at a decision not to. (Jackson Testimony, June 25, 1976, pp. 142–43).

Other substantial changes include a price increase of the Sunday paper from 15 cents to 25 cents and of the daily and Saturday papers from 10 cents to 15 cents, which had

the effect of causing a significant drop in circulation not all of which could have been recouped even by a later price reduction after rescission; the cessation of distribution in outlying geographical areas; the discontinuation of 16 syndicated features and the addition of 48 others; and a shift in editorial policy.[38] This catalogue is not exhaustive but illustrative. In short, many of the characteristics that give a newspaper its identity—editorial policy, features, price, and market, among others—were all significantly changed by the Register either before the rescission demand was made or while the claim was pending. The point is not that it would be impossible to reverse the changes, but rather that the pattern of the changes indicates the Register's intention to treat the Times as its own.

Equally supportive of the conclusion that the Register fully considered the Times to be its own property is the highly significant pattern of steps to integrate the operation of the Times with the operation of the New Haven Register and the New Haven Journal-Courier, the two New Haven papers published by the Register. Gannett has extensively catalogued the integration moves, and again not all of them need be discussed. Illustrative are the tying in of the cold type printing system to the Register's computer system in New Haven, the removal of a Univac Computer from the Times to New Haven to render computer services for the Times in New Haven, performance of bookkeeping functions for the Times by Register personnel in New Haven, the elimination of personnel from the Times staff and the absorption of their functions by Register staff, and others. I accept the Register's explanation that these moves were made to effect economies by eliminating duplication of equipment and personnel.[39] But as these steps were taken, it inevitably became more and more difficult to view the Times as a separate entity. After these changes neither Gannett nor any potential owner other than the Register would have been able to step in and operate the paper without substantial outlays and hiring to fill in for the functions then being performed in New Haven.

Under these circumstances, the Register must be deemed to have affirmed the contract and lost its right to rescission.

## D. Possibility of Restoration of Status Quo Ante

■ If the only impediment to rescission were the fact that the value of the Times had declined, it would probably be appropriate to inquire whether the decline could ultimately be traced back to frauds perpetrated by Gannett and whether any of the responsibility for the decline should be imputed to the Register and its managerial judgments. But in view of all the evidence in the case, that inquiry is unnecessary. The absence of a reasonably prompt demand for rescission and the Register's as-

---

**38.** While the parties disagree on the philosophical labels appropriate to describe the Times editorial page before and after acquisition by the Register, they are in agreement that a shift of policy did occur.

**39.** The Register supports its "gratuitous bailee" characterization of its actions by pointing out that all the changes made were either necessary or desirable cost-cutting measures. This may well be true, but the fact that a significant change effects economies does not prove that rescission is still available. If the Register's argument were accepted, the rule of law requiring a rescinding party to refrain from acts of ownership over the property would shrink in scope to cover mismanagement or wastefulness only. The cases dealing with rescission of a going concern have never permitted substantive changes in the nature of the business,

regardless of the effect on costs. *See Gargotto v. Sherman*, 297 Ky. 597, 180 S.W.2d 565 (1944) (removal of amusement machines and victrola from restaurant); *Fryer v. Campbell*, 48 Wyo. 122, 43 P.2d 994 (1935) (continued operation of motion picture theater causing deterioration in machinery and furniture); *Meyers v. Hoops*, 140 N.E.2d 65 (Ct.App. Ohio 1955) (changes in personnel, equipment, and stock); *Caruso v. Moy*, 164 Neb. 68, 81 N.W.2d 826 (1957) (change in bill of fare of restaurant from Chinese-American to Italian-American); *Sy-Jo Luncheonette, Inc. v. Marsav Distributors, Inc.*, 279 App.Div. 715, 108 N.Y.S.2d 349 (1st Dept. 1951) (new pricing policies). Charges of mismanagement were made in the latter two cases, but the rule of law on acts of ownership applies even where the rescinder's management is beyond reproach.

sertion of acts of ownership make the rescission remedy unavailable. Furthermore, to force return of the shares of The Hartford Times, Inc. upon Gannett at this stage would clearly be inequitable. The *Times* is no longer a going concern. Its value lies primarily in the tangible assets plus whatever highly speculative good will is still in existence that would to some extent help to reestablish circulation if publication were resumed.

## IV. CONCLUSION

While I have ruled against the Register on the availability of rescission, nothing in this memorandum should be taken as reflecting any view on the amount of damages that could eventually be awarded. This is entirely an open question at this point, and if the frauds as alleged and the damages as claimed can be proven, a substantial recovery of compensatory and exemplary damages may be possible. Thus this ruling should in no way be taken as encouragement to any perpetrator of fraud. All I have ruled is that under all the circumstances the Register has lost the right it may once have had to force Gannett to take the *Times* back. It has not been shown to have lost or in any way impaired its right to compensatory or punitive damages.

Since Gannett has conceded the existence of fraud only for the limited purpose of obtaining a ruling on the availability of rescission, the next step in the litigation will be the scheduling of a trial at an early date for proof of the existence and magnitude of the frauds and the damages suffered by the Register.

The motion to amend the counterclaim is granted.

The affirmative defenses to rescission, for the reasons stated in the foregoing memorandum, have been established, and rescission will not be granted as a remedy in this case.